## AMERICAN ARBITRATION ASSOCIATION

Case No. 74 181 02154 02 SAT

MEDIA ARTS GROUP, INC.      )
                         )
      Claimant,        )
                         )
V.                         )
                         )
DAVID KAYNE,           )
TRACEY KAYNE, and      )
KAYNE GALLERIES OF GEORGIA, INC.  )
                         )
      Respondents, Counterclaimants.  )

---

## ANSWERING STATEMENT COMBINED WITH COUNTERCLAIM

---

### Answering Statement

1.     Respondents David Kayne and Tracey Kayne categorically deny any liability, responsibility, or obligation to claimant in their individual capacity because they have never entered into any agreement individually with claimant. At all pertinent times they acted only in a corporate capacity as to claimant, and are entitled to the fiduciary shield doctrine herein. Alternatively, individual Respondents adopt all allegations of corporate Respondents in these proceedings.

2.     Subject to paragraph 1 above, the term Respondents herein refers to corporate Respondents.

3.     Respondents admit general and generic facts but deny all facts alleged by claimant in support of the Demand for Arbitration.

1

Exhibit 1
Page 4

4.    Reserving all rights to amend this Answering Statement based upon discovery, Respondents further deny the Demand for Arbitration on the following grounds:

A.    Claimants fail to state a claim upon which relief can be granted.

B.    Claimants' demands are barred by waiver, estoppel, failure of consideration, failure of mutual consent, mistake of fact, mistake of law, misrepresentation, non-disclosure, and fraud.

C.    Claimants' demands are offset, and subject to set-off, by sums owed to Respondents by Claimants.

D.    Claimants' demands are based upon purported contracts which are null and void, unconscionable, unenforceable, formed by adhesion; which were induced by fraud in their inception, and which caused detrimental reliance.

E.    Claimants' demands are barred by their own breach of contract, and breach of implied covenants of good faith and fair dealing.

F.    Performance by Respondents of the obligation claimed herein was rendered impossible by the non-performance and breach by Claimants.

5.    As to the claims of trademark infringement, Respondents allege that Claimant has no registered trademarks relevant to this matter.  Specifically the terms "Thomas Kinkade", "Thomas Kinkade Signature Gallery" are not registered.  The term "Painter of Light" is not registered, as to wall art, prints, or lithographs. Since it is at least 400 years old, it has been used by numerous painters in the past and currently, and is not original with Claimants, it cannot be registered or

Exhibit 1
Page 5

enforced by Claimant.   Claimant falsely claimed ownership of trademarks it purportedly licensed to Respondents.

6. Further, as to trademark infringement claims, Respondents allege: Use by Respondents of any purported trademarks was "fair use" in good faith in its descriptive sense, and caused absolutely no confusion as to the source of the product, or the relationship of the purported trademark holder to the product. The use of the term was not for purposes of source identification or to imply sponsorship or endorsement by the trademark owner. In addition, Respondents were permitted on purchase of inventory to re-sell it as necessary.   Any termination does not prohibit sale of inventory left on hand, but does prohibit additional wholesale purchases. Otherwise, Respondents could not ever sell the inventory already on hand, which is unconscionable. To describe a print as a "Thomas Kinkade" is use in a descriptive sense, not in a trademark sense. This is also referred to as nominative use, which is permitted. These defenses are both statutory and in the common law. Surnames or personal names used are generally referred to as descriptive marks. The marketing program of MAGI has assured this.   As such, the term "Thomas Kinkade" has acquired a public distinctiveness referred to as secondary meaning, which inherently allows the consuming public to primarily associate the term with a particular source. Finally, the right to the use of the purported trademarks is not incontestable, having been abandoned in the application to the U.S. Patent and Trademark Office, and the term "Painter of Light" is generic.

3

Exhibit 1
Page 6

7.   Further, Respondents allege that the purported contracts under which Claimant demands money constitute franchises, under California law, and the California franchise laws were violated by Claimant, creating offset.

8.   The Demand for Arbitration is brought in bad faith, is groundless, and brought for purposes of harassment and intimidation, which has caused damage and loss to Respondents for which they are entitled to attorney fees, and reimbursement for arbitration expenses and costs.

WHEREFORE, Respondents pray for dismissal of the Demand for Arbitration, and for such other relief as may be just and appropriate including an award of attorney fees, and arbitration expense and costs.

Counterclaim

Respondents allege that Media Arts Group, Inc. owes them an undetermined sum of money for damages, for punitive damage, attorney fees, and other costs and expenses, and they are entitled to certain other relief as may be just and equitable, arising from the following facts and circumstances constituting their counterclaim herein.

1.   Counterclaimants are the corporate Respondents named in the Demand for Arbitration, all of which are Georgia corporations.

2.   Counterclaim Respondent is Media Arts Group, Inc. a successor by merger of Lightpost Publishing, Inc. a former California corporation, and Media Arts, Inc., a Delaware corporation, headquartered in Santa Clara County, California, known by the acronym "MAGI." MAGI is publicly traded on the New York Stock Exchange.

3.   Thomas Kinkade, a California resident, licenses to MAGI, the reproduction and marketing of his original art, under a written license.

4.    Thomas Kinkade, and close business associates, formed the two MAGI companies, ultimately taking it public, in 1995.

5.    Thomas Kinkade owns at least 35% of the common stock, is employed by MAGI as Art Director, and at all pertinent times, was a member of the Board of Directors of MAGI.

6.    Thomas Kinkade controls MAGI in every sense of the word.

7.    After going public, MAGI undertook a business and marketing plan for reproductions of Kinkade's art by establishing franchises designated as Thomas Kinkade Signature Galleries, eventually establishing about 350 of such.

8.    The Thomas Kinkade Galleries sold MAGI's Thomas Kinkade reproductions exclusively.

9.    MAGI itself owned and operated Signature Galleries, as corporate galleries, but most were owned by persons fraudulently induced by MAGI to own and invest in them.

10.    MAGI denied at all times that a franchise relationship existed between it and the dealer.

11.    MAGI required the investors preliminarily to sign documents called Dealer Agreement, and Standard Terms and Conditions, including an exclusive geographic territory called a "District."

12.    After getting these documents signed, MAGI then supplied to each Dealer, a retail minimum price list obligating the Dealer to sell MAGI art for mandatory minimum prices, prohibiting any discount prices.

Exhibit 1
Page 8

13.   To establish a prospective investor as a Signature Dealer, the prospect was required to attend, at the expense of the prospect, a week-long meeting called Thomas Kinkade University.

14.   At Thomas Kinkade University, certain aspects of the Signature Dealer program were discussed along with other details.

15.   Prospects are required to sign Dealer contracts at that time, and in their individual names since nobody had corporations pre-formed.  They were told that the documents would later be changed to reflect the corporate status of the dealers.

16.   Dealers are told at Thomas Kinkade University that they must retain a certain entity to generate a business plan acceptable to MAGI in order to be approved as a dealer.

17.   Dealers are told at Thomas Kinkade University that they must retain a person named Jann Sheehy to assist in negotiating mall lease space.

18.   Dealers are required to adhere to MAGI's Criteria for retail store design, which usually requires lease space modification, known as "build out", which is enforced by having a MAGI employee examine and approve plans, and actual construction.

19.   A marketing plan, implemented in writing, with district sales managers from MAGI, and in-store MAGI personnel to instruct dealer's employees and sales staff, and other promised support such as price lists, was explained.

20.   At Thomas Kinkade University, the prospective investor-dealers were told of the Signature Dealer program, with an exclusive territory, protected from competition,

Exhibit 1
Page 9

with numerous support mechanisms, despite any written representation to the contrary in the Dealer Agreements.

21.    At no time did MAGI make the disclosures to the counterclaimants, before or after document signing, required of Franchisors, by California law, and Federal law, and all remedies provided by law for non-disclosure are claimed herein.

22.    Material facts intentionally were omitted or misrepresented to Respondents by Media Arts prior to and during the initiation of the Dealer Agreements.

23.    Business plans proposed and furnished to Respondents intentionally were fraudulently influenced by Media Arts, and contained bogus information reasonably relied on by Respondents to their continuing detriment and injury.

24.    Media Arts had a non-disclosed and fraudulent conflict of interest in the creation of business plans furnished to Respondents, in the assistance given for negotiating leases for retail space, and in the sale of products to Respondents.

25.    Media Arts fraudulently induced Respondents to enter into Dealer Agreements and related agreements, and the written agreements are null and void in their entirety.

26.    Media Arts advised, required, and recommended to Respondents that inventory should be purchased when they knew it was not economically justified, only to enrich certain corporate personnel and Thomas Kinkade, all to the ultimate financial ruin of Respondents.

27.    Media Arts falsely advised Respondents that Kinkade's art products would increase in value, when they knew there were plans to over-saturate the market with products, by selling in to mass distribution channels.

Exhibit 1
Page 10

28.   Media Arts breached the covenant of good faith and fair dealing implied by California law in every contract by restricting retail sale prices on its products when sold by Respondents, but at the same time selling products to other retail distributors for sales below such prices creating unfair competition, deceptive trade practices, and damage to Respondents.

29.   Media Arts is in violation of California state law, Louisiana state law, and Federal law, including Anti-Trust Acts, RICO, and Federal Trade Commission Rules and Regulations.

30.   Media Arts illegally terminated the Respondents as dealers representing Media Arts.

31.   Media Arts has caused the complete financial demise of Respondents who are having to cease doing business in Kinkade products at huge expense and loss to them, causing a loss of their investment, loss of return on their investment, loss of business reputation, loss of business opportunity, entitling Respondents to compensatory damages, treble damages, punitive damages, and attorney fees, together with the cost of this arbitration. Damages are undetermined.

32.   Media Arts illegally allowed other entities to establish dealer locations in territory dedicated to Respondent while not allowing the same opportunity to Respondents, causing loss and damage.

33.   Media Arts is guilty of tortuous interference with Contract, tortuous interference with Business Relations, tortuous interference with Business Expectancy-Inspective Economic Advantage.

Exhibit 1
Page 11

34.   Media Arts is guilty of unfair trade practices as defined by the Trade Commission Act, and the Code of Federal Regulations.

35.   Media Arts is guilty of unfair business practices under California law.

36.   Media Arts is guilty of negligent misrepresentation, and fraudulent non-disclosure on which Respondents reasonably relied to their detriment and economic disadvantage.

37.   Media Arts is guilty of breach of contract, and breach of the lawfully implied covenants of good faith and fair dealing, in its agreements with Respondents.

38.   Media Arts is guilty of violation of Anti-Trust laws, unfair competition laws, and price discrimination laws, which damaged and harmed Respondents.

39.   Media Arts violated the California Franchise Investment law in entering the franchise agreement with Respondent.

WHEREFORE, Counterclaimants pray for a sum from Media Arts Group, Inc. equal to damage, treble damages, punitive damages attorney fees, and all other just and equitable relief.

MAURICE L. TYNES & ASSOCIATES, PLC

MAURICE L. TYNES, BAR ROLL #12974
4902 Ihles Road
Lake Charles, Louisiana 70605
Telephone:   337/479-1173
Facsimile   : 337/479-1287

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the above and foregoing has been served upon all counsel of record in this matter via facsimile and/or by depositing same in the

9

Exhibit 1
Page 12

U.S. mail, postage prepaid, and properly addressed on this ___3___ day of February, 2003.

MAURICE L. TYNES

Exhibit 1
Page 13

FEB.16.2004   4:35PM   ROBINSON & WOOD INC.                    NO.797    P.2/33

Archie S. Robinson (Bar No. 34789)
Christian B. Nielsen (Bar No. 87972)
Jessica A. Mahoney (Bar No. 214983)
ROBINSON & WOOD, INC.
227 North First Street
San Jose, CA 95113-1016
Telephone:   (408) 298-7120
Facsimile:    (408) 298-0477

Attorneys for Respondents
DAVID KAYNE, an individual, TRACEY
KAYNE, an individual, KAYNE ART
GALLERIES OF GEORGIA, INC., a
corporation,

**FILE COPY**

**RECEIVED**

**FEB 1 7 2004**

ALSCHULER GROSSMAN
STEIN & KAHAN LLP

## AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| MEDIA ARTS GROUP, INC., a corporation | Case No. 74 181 02154 02 SAT |
| Claimant, | **RESPONDENT/CROSS-CLAIMANTS' ARBITRATION BRIEF** |
| v. | Date:  February 23, 2004 |
| DAVID KAYNE, an individual, TRACEY KAYNE, an individual, KAYNE ART GALLERIES OF GEORGIA, INC., a corporation, | |
| Respondents. | |

# I.
## INTRODUCTION

In 1997 David Kayne, who lives in Atlanta, became aware of a potential business opportunity as a Signature Gallery dealer for Media Arts Group, Inc. (MAGI.)  Media Arts is the entity which markets the images of Thomas Kinkade.  Mr. Kayne learned about this opportunity from Norman Mahoney, the father of Brian Mahoney.  At that time Brian was employed by Media Arts as the Senior V.P. of Sales.

1

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

RESPONDENT / COUNTER CLAIMANTS' ARBITRATION BRIEF

Exhibit 2
Page 14

FEB.16.2004   4:35PM   ROBINSON & WOOD INC.                    NO.797    P.3/33

As a result of the information he received from the Mahoneys, in 1998 Mr. Kayne attended, at his own expense, Thomas Kinkade University (TKU), a one week seminar put on by the marketing arm of MAGI. This seminar was held in Monterey, California where Mr. Kayne attended presentations given by officers and employees of Media Arts where they made specific representations as to the success of the company in general and the Signature Gallery Dealers in particular. They indicated that based upon the past successes dealers, they anticipated the success of future Signature Gallery Dealers.

What Mr. Kayne encountered at TKU was a stylish and convincing presentation. He was told that the Signature Gallery program was "the crown jewel" of the organization and was the exclusive retailer of "high end" Kinkade images. He was promised impressive returns on his investment, he was promised support and assistance to make his gallery successful, and he was promised an exclusive territory in the greater Atlanta market. MAGI presented the Signature Gallery opportunity as a "plan" that, if followed, would blossom into a thriving and profitable gallery business. MAGI representatives told Mr. Kayne that only two Signature Galleries in the history of the program had failed, one was because the owner had cancer and the other was because the owner had committed suicide.

As part of the "plan", Mr. Kayne was instructed that he was to purchase a business plan from one of MAGI's "independent" business plan consultants. While at TKU he paid a company called Pebble Beach Financial $3,450 to prepare a business plan for him. The business plan was not completed until November of 1998. He was instructed as to where his galleries should be (high end malls) and the exact

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

2

Exhibit 2
Page 15

1   specifications for building out his gallery to fit into the system. Mr. Kayne also received

2   "consultations" from the retail development team, including advice from Rick Barnett as

3   to his opening order of inventory.

4

5       Mr. Kayne was told that the Atlanta area was "wide open." However, a great

6   sense of urgency was conveyed to Mr. Kayne during his week at TKU, and by the last

7   day he had been convinced that if he did not sign a territory agreement before he left

8   TKU there was a very good chance someone else would scoop up his desired territory.

9   Mr. Kayne was assured that by signing the agreement he was simply committing to

10  developing the Atlanta territory and that MAGI understood he had not yet had a chance

11  to go home and create a corporation to own and operate the galleries. Mr. Kayne was

12  told that MAGI was not interested in holding him personally responsible for the

13

14  agreements, and that MAGI knew the agreement would be between MAGI and the

15  company that Kayne incorporated when he returned home to Georgia. Based upon the

16  many representations he received at TKU, Mr. Kayne signed the agreement and was

17

18  looking forward to a bright future selling the works of Thomas Kinkade.

19

20       Unfortunately, at the time he entered into the relationship, there was much that

21  Mr. Kayne did not know about the company, and much that the company did not reveal

22  to him. For instance, MAGI failed to mention to Mr. Kayne that the profit numbers

23  presented at TKU were not at all representative of the performance of other dealers.

24  MAGI did not tell Mr. Kayne that at the very same time that he was opening his first

25

26  Signature Gallery, it was planning on opening a corporate gallery (which could sell the

27  same items Mr. Kayne was permitted to sell) less than 7 miles from Mr. Kayne's first

28

                            3

Exhibit 2
Page 16

gallery.

MAGI did not tell Mr. Kayne that the business plan he was required to purchase was not provided by "independent" planners. Mr. Kayne was not told that Rick Barnett had a personal financial interest in the amount of inventory he counseled Mr. Kayne to order for his initial order. Mr. Kayne was not told that MAGI used the requirement that Kayne purchase a certain amount of inventory for his galleries as a vehicle for engaging in the practice of "stuffing the channels" to inflate sales numbers for Wall Street. Mr. Kayne was not told that at the time he was opening a gallery to participate in MAGI's new "Masters of Light" (MOL) program, MAGI had terminated its contract with the two artists who were to be sold, along with Mr. Kinkade, through MOL galleries.

Shortly after leaving TKU, with the help of another "independent" consultant required by MAGI named Jann Sheehy, Mr. Kayne committed to lease space at Phipps Plaza, an upscale mall in the Atlanta area. In late October of 1998, Mr. Kayne opened his first gallery at Phipps Plaza. While he was making preparations to open his first gallery, Mr. Kayne was approached by Media Arts and told that more galleries needed to be opened in the Atlanta area. In August of 1998, his territory was expanded, and through Jann Sheehy Mr. Kayne was committed to opening two more galleries in his territory before his first gallery was open for business. Mr. Kayne was told if he didn't act quickly, there were others who were willing to open those galleries in his area.

Mr. Kayne was instructed that he had to abide by MAGI's retail sales policy (RSP), and sell items for the prices listed by MAGI. Mr. Kayne was told he was not permitted, under any circumstances, to offer items for less than the prices listed by

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

4

RESPONDENT / COUNTER CLAIMANTS' ARBITRATION BRIEF

Exhibit 2
Page 17

1   MAGI, although he could charge more. He was not permitted to give his customers any

2   discounts whatsoever and this prohibition included providing free shipping or free items

3   with purchase. It was also clear, based on the representations of MAGI, that Media Arts

4   would not engage in discounting. Mike Hopper, Mr. Kayne's District Sales Manager

5   (DSM) told him that Media Arts would not discount because it would harm the integrity

6   of the art. However, while Mr. Kayne was contractually obligated to follow MAGI's

7   RSP, the Corporate Gallery MAGI opened in his district did offer its customers free

8   products with purchase, and other perks. Worst of all, MAGI began to engage in the

9   systematic deep discounting of its images through "alternative distribution channels"

10  such as Tuesday Morning, Hobby Lobby and Red Dot, as well as on cruise ships and

11  through QVC. This discounting, which was contrary to the express representations of

12  MAGI, ruined Mr. Kayne.

13          Mr. Kayne and other Signature Gallery owners were told that the marketing

14  strategy for the company was to promote Kinkade and the products sold by the galleries

15  as "upscale" and "collectable". In fact, MAGI set upon a "branding" and marketing

16  campaign that had the exact opposite effect. Not only did MAGI allow limited edition

17  Kinkade images to be sold at deep discounts by bargain basement discounters, MAGI

18  licensed Kinkade images for every conceivable knick-knack known to man or beast.

19  There are Kinkade mugs, nightlights, rugs, cross-stitch patterns, dolls, trains, calendars,

20  ceramic figurines, playing cards, popcorn tins, bible covers, plates, etc. in every

21  conceivable retail outlet including discount stores like Wal-Mart all the way to school-

22  fundraiser type catalogs. In short, Kinkade images are not exclusive, and the market has

ROBINSON & WOOD,
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1215
(408) 298-7120

5

RESPONDENT / COUNTER CLAIMANTS' ARBITRATION BRIEF

Exhibit 2
Page 18

been saturated to such an amazing degree by MAGI that there is no way an exclusive gallery system is even a viable marketing strategy anymore. Media Arts followed this marketing strategy with full knowledge that it would destroy dealers.

In December of 2002, MAGI initiated this arbitration against Respondents, who filed their answer and counterclaims against MAGI in early 2003. Specifically, Counter-claimants have alleged violations of California's Franchise Investment Law, intentional and negligent misrepresentation, fraud, breach of contract, tortuous interference with business relations, anti-trust violations, and unfair business practices under California law. What follows is a brief statement of the law on each of these claims, and a brief explanation of counterclaimants' position so that the Panel may have something of a roadmap to guide it through the arbitration.

## II.
## DISCUSSION

### A. The Dealer Agreements Are Invalid Contracts:

#### 1. The Dealer Agreements Are Unenforceable Because They Were Fraudulently Induced:

One who has been induced by fraudulent misrepresentations to enter into a contract may have that agreement set aside and obtain restitution of any benefits lost to him by that agreement. (*Wilke v. Coinway* (1967) 257 Cal. App. 2nd 126, 136.) In order for a misrepresentation to be fraudulent, it must be made with the knowledge that it is, or may be, untrue and made with the intention that the person to whom it is made will act in reliance thereon. (*Id.*) Furthermore, the reliance must be justified. (*Id.*)

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1115
(408) 298-7120

6

RESPONDENT / COUNTER CLAIMANTS' ARBITRATION BRIEF

Exhibit 2
Page 19

In this case, as more fully set forth below, Media Arts made numerous misrepresentations to Mr. Kayne to get him to enter into the Dealer Agreements.  He was given potential profit numbers that were not supportable, he was told that the items he would be selling in his gallery were collectible and exclusive, he was told that MAGI would not directly compete with him in his area, he was told that his business planners (who determined the number of galleries he would be expected to open in his territory) were independent, and he was told that there would be no discounting of Kinkade images.  Each of those representations were false when they were made to Mr. Kayne, and he reasonably relied upon them in deciding to open his galleries and do business with MAGI.

MAGI may try to dismiss some of the above statements (especially those about profitability) as mere salesmanship or "puffing", but they were not presented to Mr. Kayne as vague possibilities, but as actual likelihoods.  A statement becomes a fraudulent misrepresentation "...when a representation concerning the subject matter of a transaction which might ordinarily be only the expression of an opinion is asserted as an existing fact, material to the transaction, and which has a reasonable tendency to induce one of the parties to the transaction to consider and rely upon such representation as a fact, the statement then becomes an assertion of an existing fact within the meaning of the general rule as to fraudulent misrepresentations." (*Id.* at 137.)

Moreover, with regard to the misrepresentations about profitability, MAGI may not avoid rescission of the contract on the theory that Mr. Kayne failed to make an adequate inquiry.  (*Rogers v. Bill and Vince's* (1962) 203 Cal. App. 2nd 292, .)  In

ROBINSON & WOOD
INC.
227 North Perry Street
San Jose, CA 95113-1016
(408) 298-7200

7

Exhibit 2
Page 20

1   *Rogers*, seller misrepresented the gross income of the restaurant it was selling.  The

2   misrepresentation was material because it related to the profitability of the restaurant.

3   (*Id.* at 295.)  But because it was an intentional misrepresentation, seller could not avoid

4   rescission of the contract on the basis that buyer did not inquire into the

5   misrepresentation. (*Id.* at 299.)

6

7   ### 2.The Dealer Agreements Are Unconscionable Adhesion Contracts, and Therefore Unenforceable:

8

9   A contract of adhesion "signifies a standardized contract, which, imposed and

10  drafted by the party of superior bargaining strength, relegates to the subscribing party

11  only the opportunity to adhere to the contract or reject it." (*Graham v. Scissor-Tail*

12  (1981) 28 Cal. 3rd 807, 817, citing *Neal v. State Farm Ins.* (1961) 188 Cal. App. 2nd

13  690, 694.) Here, the dealer agreements were standardized and imposed by MAGI, a

14  company of superior strength vis-a-vis an independent dealer.  The rigidity of these

15  agreements are demonstrated by the inclusion of language to the effect that the

16  agreement is not unconscionable, not vague, and basically an arms length transaction.  A

17  quick review of the document demonstrates that it only goes one way.

18  When the first agreement was presented to Mr. Kayne after he opened his first

19  gallery, he was relegated to either adhering to the terms of the contract or rejecting it.

20  Mr. Kayne was in no position to refuse to sign the agreements or open the dealerships

21  because if he refused to do so, his territory would be taken away and his existing gallery

22  would be destroyed.  Moreover, Mr. Kayne was told that the more galleries he opened,

23  the more profitable all of his galleries would become.  In fact, MAGI knew that opening

28

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
San Jose, CA 95113-1016
(408) 298-7120

8

Exhibit 2
Page 21

more galleries in a single territory was *not* likely to make a dealer more profitable, it would only commit him to purchasing more inventory.

### a. The Adhesive Agreements Should Not Be Enforced Because Their Remedy Provisions Are Contrary to the Expectations of the Parties.

If the adhesion contract, or a particular provision, does not fall within the reasonable expectations of the weaker party, then such provision will not be enforced against him. (*Graham*, Supra, at 820.) In this case, of particular concern are the portions of the agreement which severely limit the damages Mr. Kayne may recover as a result of the wrongful acts of MAGI. Those provisions are unenforceable, even if the Panel is inclined to enforce the majority of the agreement.

Those provisions were contrary to Kayne's reasonable expectations. Initially, they were placed on the thirteenth page of a fourteen page contract in an addendum of "standardized terms and conditions" that was behind the individualized portion of the contract. When he signed the agreement, Mr. Kayne's did not expect that he would lose his rights to any consequential or punitive damages for harm caused by Media Arts.

In *Graham*, the provision requiring arbitration of disputes was not found to be contrary to the expectations of plaintiff promoter because he had been a party to "thousands" of contracts with the performer's union containing a similar provision and promoted 15 or more concerts for defendant performer, where he signed a similar agreement. (*Graham*, 28 Cal. 3d at 821.) In contrast, Mr. Kayne had never contracted with Media Arts before the subject contract, and did not have an extensive history of contracting with them, and had never been subject to the remedies before, and it was not

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

9

RESPONDENT / COUNTER CLAIMANTS' ARBITRATION BRIEF

Exhibit 2
Page 22

his expectation of the way to deal with another contracting party.

The Panel should note that many of the terms of the agreement (mandatory purchases and roll-outs of new galleries) were specifically renounced by officers of Media Arts at Dealer Meetings.

### b. The Adhesive Agreements Are Unconscionable:

Unconscionable contracts need not be enforced in California. (Civ. Code §1670.5) Unconscionability is composed of two elements: procedural and substantive. (*American Software v. Ali* (1996) 46 Cal. App. 4th 1386, 1390.) While both are generally required, a sliding scale may be applied if there is an extraordinary amount of one of the elements. (*Id.* at 1391.)

The procedural aspect of unconscionability focuses on two factors: oppression and surprise. (*Pardee Construction Co. v. The Superior Court of San Diego County* (2002) 100 Cal. App. 4th 1081, 1088.) Oppression refers to both inequality of bargaining power and the absence of "real negotiation," or "a meaningful choice." (*Id.*) Surprise results from hiding a controversial provision in the contract. (*Id.*)

In *A&M Produce*, the terms of the consequential damage exclusion were not apparent because they were only slightly larger than most of the other contract text. (135 Cal. App. 3rd at 490.) The provision was located on the middle of the back page of a long preprinted form contract, which was only "casually shown" to plaintiff. (*Id.*) It was also never suggested to plaintiff that its owner should read the back of the form. (*Id.*) As a result, the court found that provision procedurally unconscionable, and because the court found the provision was substantively unconscionable, the provision was

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

RESPONDENT / COUNTER CLAIMANTS' ARBITRATION BRIEF

Exhibit 2
Page 23

1    unenforceable.  (Id. at 490-491.)

2        Likewise, in the present matter, there was no difference in size of text in the

3    remedies portion of the dealership agreement.  It was located on pages 13 and 14 of a 14-

4    page agreement, it was presented to Mr. Kayne a month _after_ he had opened his first

5    gallery, and Mr. Kayne was not in a position to carefully review every aspect of the

6    contract while trying to get the open gallery up and running.

7        Furthermore, because of the discrepancy in bargaining power between Mr. Kayne

8    and Media Arts, there is still another aspect of procedural unconscionability.  (_Pardee_

9    _Construction Co. v. Sup. Ct. San Diego_, (2002) 100 Cal. App. 4th 1081, 1089,

10   (provisions in defendant construction company's agreements requiring parties to submit

11   their disputes to judicial reference were unconscionable. )

12       In _Pardee_, the court found that plaintiff purchasers of entry-level homes "stood in

13   an economic position well below Pardee," who was the developer of hundreds of homes,

14   much like a single gallery owner in relationship to a large company like Media Arts. (_Id._)

15   Moreover, the judicial reference provisions were contained in all agreements for the

16   purchase of homes from defendant.  (_Id._)  Similarly, provisions regarding consequential

17   damages, punitive damages and waiver of a jury trial are found in all Media Arts'

18   dealership agreements.  This is evidence that Kayne had no meaningful choice with

19   respect to accepting these provisions.  (_Id._)  In addition, no home buyer in _Pardee_ struck

20   out the provision, demonstrating there was no opportunity for negotiation, much like in

21   the present matter where no dealer has successfully removed any provision from a dealer

22   agreement.  (_Id._)

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 998-7120

11

RESPONDENT / COUNTER CLAIMANTS' ARBITRATION BRIEF

Exhibit 2
Page 24

Even when both parties are businesspeople, there may be unfair surprise or inequality in bargaining power in the business context, as exists in the present matter. (*A&M Produce v. FMC* (1982) 135 Cal. App. 3rd 473, 489.)  In *A&M Produce*, plaintiff purchaser of farming equipment was a large-scale farm employing five persons on regular basis and fifty seasonal employees and farmed about 8,000 acres. (*Id.* at 491.)  However, the court found that he did not have the same bargaining power as defendant manufacturer because gross sales of just its agriculture machinery division amounted to $40 million. (*Id.* at 491.)  Provisions relating to the disclaimer of warranties and the exclusion of consequential damages in the form contract for the purchase and sale of farming equipment was found unconscionable in part because of this inequality in bargaining power. (*Id* at 493.)  In this case, Media Arts is a company with more than $100 million in sales.

Substantive unconscionability concentrates on the disputed term being "overly harsh" or "one-sided," and there being no justification for its harshness or one-sidedness at the time of the making of the agreement. (*Vance*, 36 Cal. App. 4th at 709.)  In this case, the contract is, as the drafter intended it; completely one sided in favor of Media Arts.

### 3. A Waiver of Punitive Damages Violates Public Policy and Should Not Be Enforced.

Because it is against public policy and in violation of California Civil Code §1668 to exempt one's responsibility for fraud or injury, the provision waiving consequential and punitive damages in the dealership contract between Kayne and Media Arts should

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 98113-1036
(408) 598-7120

12

RESPONDENT / COUNTER CLAIMANTS' ARBITRATION BRIEF

Exhibit 2
Page 25

1   not be enforced. According to California Civil Code §1668, "all contracts which have

2   their object, directly or indirectly, to exempt anyone from responsibility for his own

3   fraud, or willful injury to the person or property of another, or violation of law, whether

4   willful or negligent, are against the policy of the law." Moreover, in *Pardee*, the

5   appellate court agreed with the trial court that this portion of the subject contract was

6   substantively unconscionable in part because of C.C.P. §1668. (100 Cal. App. 4th at

7   

8   1091.)

9

10   **4. Waiver of Consequential Damages in the Dealer Agreement Is**
     **Unconscionable and Unenforceable:**

11

12   Consequential damages limitations may be declared unconscionable. (Cal. UCC

13   §27193.) In *Pardee*,  the court declined to enforce the jury trial waiver found in the

14   contract because it benefited nobody but defendants and was one sided. (*Pardee*, 100

15   Cal. App. 4th at 1091.)  Similarly, just as there was no benefit accorded to plaintiffs in

16   *Pardee* in their waiver of a jury trial, there also is no benefit to Mr. Kayne in his agreeing

17

18   to waive Media Arts' responsibility for any "indirect, incidental or consequential

19   damages..." (*Id.*)  Because of the one-sidedness of this portion of the agreement, it is

20   equally unconscionable and unenforceable.

21

22   In short, the dealer agreements are one-sided unconscionable contracts of

23   adhesion that this panel should decline to enforce.

24

25   **B. California Franchise Investment Law**

26   Media Arts is likely to vigorously contest its status as a franchisor, however if it

27   walks like a duck, quacks like a duck, swims like a duck, and meets the legal definition

28

13

RESPONDENT / COUNTER CLAIMANTS' ARBITRATION BRIEF

Exhibit 2
Page 26

1  of duck, it's a duck.  Under the California Franchise Investment Law, a business is a

2  franchise if 1) the franchisee is granted the right to engage in the business of offering,

3  selling, or distributing goods or services under a marketing plan or system prescribed in

4  substantial part by a franchisor; 2) the franchisee's business is substantially associated

5  with the franchisor's trademark, service mark, trade name, logotype, advertising, or other

6  commercial symbol designating the franchisor or its affiliate; and 3) the franchisee is

7  required to pay, directly or indirectly, a franchise fee. (Cal. Corp. §31005(a).)

8  

9  

10      The dealer agreements at issue here are actually franchise agreements, and the

11  Kayne galleries are indeed franchises under those agreements.  With regard to the first

12  element, each dealer agreement grants Counter-claimants the right to operate a Signature

13  Gallery and the dealer is obligated to operate according to the system dictated by Media

14  Arts.  Counter-claimant was obligated to attend TKU and engage the services of MAGI's

15  business planners and other consultants as dictated by Media Arts.  These requirements

16  were in furtherance of the "plan" that, if followed, was supposed to lead to a successful

17  business.

18  

19  

20      Likewise, the dealer agreement itself obligates Counter-claimants to observe

21  many aspects of a marketing plan or system.  The dealer is required to have his gallery

22  open a certain number of hours and days (Dealer Agreement ¶ 3(h)), maintain a

23  minimum level of inventory (Dealer Agreement ¶ 3(i)), display images in a dedicated

24  stand-alone gallery approved by MAGI, (Dealer Agreement ¶ 3(j)), advertise a minimum

25  of 4 times a year in an approved manner (Dealer Agreement ¶ 3(m)), all of dealer's staff

26  must complete video training if dealer is to become "certified", (Dealer Agreement ¶

27  

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1816
(408) 298-7120

14

RESPONDENT / COUNTER CLAIMANTS' ARBITRATION BRIEF

Exhibit 2
Page 27

FEB-18-2004   4:39PM   ROBINSON & WOOD INC.                   NO.797   P.16/33

3(n), dealer must attend and complete training programs as required by MAGI (Dealer Agreement ¶ 3(o)), and dealer must use required or standard signage as required by MAGI, (Dealer Agreement ¶ 3(p).)  The dealer agreement, combined with the required consulting services, demonstrate that Counterclaimants were selling goods under the marketing plan or system dictated primarily by MAGI, the franchisor.

The second element requires that the franchisee be substantially associated with franchisor's commercial symbols designating the franchisor or its affiliates.  In addition to the required signage mentioned above, MAGI granted dealer the right to use certain trademarks ((Dealer Agreement ¶ 2(e), the right to host a Thomas Kinkade appearance (Dealer Agreement ¶ 2(d)), and upon request the dealer could receive a Signature Gallery window emblem (Dealer Agreement ¶ 2(r)) as well as a personalized photo of Thomas Kinkade and a Signature Dealer Certificate (Dealer Agreement ¶ 2(n).)  As part of the Dealer program, Counter-claimants became substantially associated with the commercial symbols of MAGI and sold the merchandise according to MAGI's plan and direction.

The final element is the payment of a franchise fee.  The Corporations Code indicates that the franchise fee may be either direct or indirect.  (Cal. Corp. §31005(a)(3).)  In this instance, the fee was indirect.  First, Kayne was required, as a condition to opening a gallery, to attend TKU at his own expense.  Further, the dealer was required to prepay for an opening order that had to include at least one of each Thomas Kinkade limited edition image still available from MAGI(Dealer Agreement ¶ 3(b).)  The dealer was also required to purchase from MAGI a minimum of $100,000 worth of merchandise for each gallery, each year (Dealer Agreement ¶ 3(a).)  Dealer was

RESPONDENT / COUNTER CLAIMANTS' ARBITRATION BRIEF

Exhibit 2
Page 28

1   further required to accept an <u>automatic</u> shipment of three each of every new limited

2   edition release(Dealer Agreement ¶ 3(d)), and 60% of dealer product orders were

3   required to be "Gallery Proof" (one of the most expensive types) product. (Dealer

4   Agreement ¶ 3(e).)  These burdensome inventory requirements were not dependent on

5   the dealers' actual needs for the inventory in his store.  The dealer could order items he

6   believed would sell well in his particular market or customer base, but that was only <u>after</u>

7   he met all of the inventory and spending requirements imposed by the dealer agreement.

8   For example, if Kayne knew that a particular new image would not sell well at his store,

9   he was still obligated to accept the automatic shipment of 3 of that item, even though he

10   knew he would not be able to sell that inventory.  The requirement that a dealer purchase

11   inventory he did not need or want is yet another example of an indirect franchise fee.

12

13   Each of the dealer agreements Counter-claimants entered into with MAGI were

14   franchise agreements.  It is undisputed that MAGI did not register as a franchise and that

15   MAGI did not provide franchise disclosures to Counter-claimants.  Therefore, MAGI is

16   liable to Counter-claimants for damages in connection with the failure to disclose as well

17   as in connection with the misrepresentation made to Counter-claimants in the course of

18   selling the franchise to counterclaimants.  (See Corp. Code §§ 31300 and 31301.)

19   <u>C. Misrepresentation and Fraud:</u>

20   The fraud and misrepresentation claims center around several representations

21   made to Mr. Kayne during his time at TKU, and throughout his dealings with MAGI.

22   The following are representations made to Mr. Kayne that Media Arts either knew, or

23   should have known, were untrue.  These representations support an award of punitive

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

16

Exhibit 2
Page 29

further required to accept an <u>automatic</u> shipment of three each of every new limited edition release(Dealer Agreement ¶ 3(d)), and 60% of dealer product orders were required to be "Gallery Proof" (one of the most expensive types) product. (Dealer Agreement ¶ 3(e).)  These burdensome inventory requirements were not dependent on the dealers' actual needs for the inventory in his store.  The dealer could order items he believed would sell well in his particular market or customer base, but that was only <u>after</u> he met all of the inventory and spending requirements imposed by the dealer agreement. For example, if Kayne knew that a particular new image would not sell well at his store, he was still obligated to accept the automatic shipment of 3 of that item, even though he knew he would not be able to sell that inventory.  The requirement that a dealer purchase inventory he did not need or want is yet another example of an indirect franchise fee.

Each of the dealer agreements Counter-claimants entered into with MAGI were franchise agreements.  It is undisputed that MAGI did not register as a franchise and that MAGI did not provide franchise disclosures to Counter-claimants.  Therefore, MAGI is liable to Counter-claimants for damages in connection with the failure to disclose as well as in connection with the misrepresentation made to Counter-claimants in the course of selling the franchise to counterclaimants.  (See Corp. Code §§ 31300 and 31301.)

C. Misrepresentation and Fraud:

The fraud and misrepresentation claims center around several representations made to Mr. Kayne during his time at TKU, and throughout his dealings with MAGI. The following are representations made to Mr. Kayne that Media Arts either knew, or should have known, were untrue.  These representations support an award of punitive

ROBINSON & WOOD
INC.
227 North First Street
San Jose, CA 95113-1016
(408) 298-7120

16

Exhibit 2
Page 30

AUG. 18. 2004    4:40PM    ROBINSON & WOOD INC.                    NO. 757    P. 18/33

damages.

### 1. Media Arts Would Not Discount or Over-Saturate:

Mr. Kayne was assured at TKU and continually throughout his dealings with MAGI that MAGI would not engage in discounting or branding activities that would injure Mr. Kayne's business. In fact, MAGI was aware of discounting by corporate galleries as well as the discounting of limited edition merchandise by bargain basement stores such as Tuesday morning and Hobby Lobby, as well as discount sales on cruise ships. When the first instance of mass discounting occurred, the dealers were assured by the company president, Anthony Thomopolous, that it would never happen again. In fact it did happen again, on a repeated basis. Further, MAGI embarked upon an intentional "branding" campaign that resulted in the absolute flooding of the market with Kinkade images on every available surface.

The discounting and over-saturation injured Mr. Kayne's business because, as was represented to him at TKU, his business model relied on the exclusivity and collectability of the Kinkade images he sold. The fact that limited edition pieces sold in Kayne's galleries were also available at deep discounts from bargain stores combined with the mass availability of Kinkade images as puzzles and snow globes completely wiped out any collectability or exclusivity previously associated with the images sold in Mr. Kayne's galleries.

### 2. Over-Saturation, and Discounting Were *Good* for Dealers:

When dealers expressed to MAGI their concern over the market saturation and discounting of Kinkade images, MAGI responded by informing dealers, including Mr.

ROBINSON & WOOD
INC.
227 North First Street
San Jose, CA 95113-1016
(408) 298-7120

17

Exhibit 2
Page 31

1    Kayne, that the discounting was a one time event that would never occur again, and the

2    "branding" (MAGI's term for their program of market over-saturation) and sales through

3    outlets such as Tuesday Morning and QVC actually *helped* the dealers' business. That

4    position was absolutely contrary to Mr. Kayne's experience. The truth was that Mr.

5    Kayne's customers refused to pay the high prices in Mr. Kayne's galleries (prices

6    dictated by MAGI) when they could purchase the same or similar images for much less

7    at a discounter. Further, when an artist's images are splayed over every conceivable

8    consumer item, the collectability and "cache" of that artist decreases exponentially with

9    every doll and nightlight that hits the market.

10        At the time that MAGI promised Mr. Kayne that it would not discount or

11    otherwise injure the exclusivity of his business, it knew that discounting was in fact

12    going on and was injuring dealers. Media Arts also knew that its marketing plan

13    involved complete market saturation, and that that plan was causing damage to Signature

14    Dealers.

15

16        ### 3. The Business Planners Are Independent:

17        Mr. Kayne was also told that the business planners he was required to hire to

18    prepare his business plan before he could become a signature dealer were "independent."

19    In fact, there was nothing at all independent about the business planners. They were the

20    agents of Media Arts. At the very same time that Mr. Kayne was paying them to prepare

21    his business plan, MAGI was controlling not only the business planners, but the numbers

22    that went into the business plan. All of the business plans were essentially formulaic pre-

23    written plans with the names of the dealers and the names of the territories inserted. The

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

18

Exhibit 2
Page 32

FEB 16 2004   4:40PM   ROBINSON & WOOD INC.                    NO.797    P.20/33

specific numbers, including market and demographic numbers, as well as the number of galleries to be opened in a specific territory, were provided to the business planner by MAGI and then inserted into the pre-prepared plan.

Rick Barnett told the business planner how many galleries should be opened in a given territory. This is problematic for several reasons. First, Barnett had a personal financial interest in opening as many galleries as possible because, as V.P. of Retail Development, his bonuses reflected the number of galleries he was able to get open in a given year. The opinions of the "independent" planner as to how many galleries a particular area could support were not the main consideration for the number of galleries in a given territory. What was important was how much capital the potential dealer had (MAGI insisted on financial disclosure forms from potential dealers before allowing them to go forward with business plans.)

The determination of the number of galleries that should be opened in a given territory was not based upon any sort of market or demographic research of the area, the decision was largely based upon the whim of MAGI. The number of galleries called for in the business plan had a major impact on the dealer because the dealer was required to open the number of galleries specified in the business plan (Exh. A to Dealer Agreement at ¶5(e).) If the dealer did not manage to "aggressively develop" his territory, that is open the number of galleries reflected in his business plan, MAGI would simply take all or part of that dealer's territory. No consideration was given for the performance of an open gallery before MAGI demanded that another be opened. This practice became so harmful that the president of the company said it would stop. In fact, it did not.

ROBINSON & WOOD
INC.
227 North First Street
San Jose, CA 95113-1016
(408) 298-7120

19

Exhibit 2
Page 33

It was in MAGI's interest to insist that the galleries be opened, and the performance of the gallery was of very little concern to MAGI because of the automatic sales built in with every opened gallery.  When a dealer would express concern over opening another gallery when galleries already open weren't performing very well, MAGI would respond by telling the dealer that *more* galleries would make all of galleries more profitable.  This was simply not true.

Had the business planners been truly independent, provided truthful information by MAGI, and given Mr. Kayne a personalized business plan based on the planners expertise as well as market and demographic research of his area, Mr. Kayne would not have been forced into opening galleries his market simply could not support, especially in light of the decreasing desirability of the product due to MAGI's market saturation strategy.

### 4. MAGI Assured Mr. Kayne It Would Not Compete With Him In His Territory:

Still another misrepresentation presented to Mr. Kayne was the assurance that MAGI would not compete with him in his territory.  Although it is true that the dealer agreement states that MAGI retained the right to open non-signature stores in his area, Mr. Kayne specifically asked whether MAGI planned to do so and was told that it did not.

In fact, a mere two months after Mr. Kayne attended TKU, he found out that MAGI was putting a corporate gallery in his territory, less than 7 miles from the location of his first gallery.  Mr. Kayne was eventually forced to purchase that corporate gallery

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

20

Exhibit 2
Page 34

AUG.18.2004    4:41PM    ROBINSON & WOOD INC.                    NO.797    P.22/33

from MAGI in order to preserve his business and his territory.

### 5. Profit Potential of Galleries:

When Mr. Kayne attended TKU, the numbers he was given for profit potential were numbers that MAGI knew were unlikely to be duplicated by dealers in the Signature Gallery program. Mr. Kayne was told he could expect to realize profits of 14-16%. His business plan predicted profits of 14-15%.

### 6. Thomas Kinkade Authored The Original Paintings:

Finally, Mr. Kayne was led to believe that all of the images he would be selling at his gallery were reproductions of original paintings actually painted by Mr. Kinkade. In fact, while it is true that Kinkade was involved in the painting of many of the images, he did not paint them all. Rather than attend to the dreary task of actually painting pictures, Mr. Kinkade would instead "conceptualize" images for other people to paint, or delegate that task to others. For instance, Mr. Kinkade would instruct a cottage be placed in the left hand corner with a babbling brook and a bridge in the foreground. Paid artists would then actually paint the picture, or put the picture together on a computer using portions of images from other Kinkade works, and Kinkade would sign the painting as his own.

Although Mr. Kayne believed that all of the images he purchased from Media Arts (indeed the images he was *obligated* to purchase) for sale in his store were reproductions of original Thomas Kinkade paintings. In fact, they were not. This fraud is problematic because even allowing for the possibility Kinkade does paint some of the images sold by MAGI, all of the images become suspect and are tainted by the existence of images, sold as Kinkades, that are not reproductions of original Kinkade paintings

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

21

Exhibit 2
Page 35

1  authored by Kinkade himself.

2      Mr. Kayne relied on the above representations in opening and conducting his

3  business. He believed he MAGI would work with him to help him be successful. He

4

5  believed his business would be profitable, as long as he followed MAGI's plan, which he

6  did. He did not expect that he would be run out of business by MAGI's predatory and

7  fraudulent business practices.

8

9      **D. Tortious Interference With Business Relations:**

10      Through operation of his galleries, Mr. Kayne was able to build relationships with

11  his customer base. Many of his customers were repeat customers and collectors who had

12  developed an interest in the works of Kinkade. Media Arts knew of the relationships Mr.

13

14  Kayne built up with his customers, as Media Arts suggested many of the techniques used

15  to build client relationships, for example receptions for customers and other special

16  "invitation only" events.

17

18      When Media Arts began allowing limited edition product to deep discount

19  retailers, it knowingly interfered with Mr. Kayne's relationship with his customers.

20  Customers who purchased items from Mr. Kayne because they enjoyed Kinkade's

21  images were no longer willing to pay the prices Mr. Kayne was obligated to charge them

22  and instead purchased product from the deep discount retailers. Customers who were

23  willing to purchase more expensive items from Mr. Kayne did so because of the

24

25  collectability and exclusiveness of the items. When Kinkade images became available at

26  "bargain" stores, that aura of collectability and exclusivity was destroyed and Mr. Kayne

27  lost those customers as well. But for Media Arts' dumping of discount merchandise and

28

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

22

Exhibit 2
Page 36

1    over-saturation of the market, Mr. Kayne would have continued to enjoy his relationship

2    with his customers.

4        The claims of tortuous interference support an award of punitive damages.

5        ## E. Breach of Contract

6        Although Counter-claimants wholeheartedly disagree that the dealer agreement is

7    a binding and valid contract, if this panel determines that it is, then it was breached by

8    MAGI. First, the covenants of good faith and fair dealing were breached during the

9

10   course of the parties' dealings by virtue of MAGI's fraud and the numerous

11   misrepresentations made to Mr. Kayne and chronicled above.

12       Further, the promises of exclusivity of territory and that MAGI would not

13   discount or otherwise cheapen the name and images of Kinkade were likewise breached.

14

15   Also, implicit in the contract is the assumption that the products counter-claimants were

16   agreeing to buy, and the products that MAGI was agreeing to sell were reproductions of

17   images actually created by Thomas Kinkade. Because Kinkade did not create many of

18

19   the originals, Media Arts did not fulfill its obligation to provide reproductions of

20   Kinkade originals to counter-claimants.

21       ## F. Anti-Trust Violations – Sherman Act

22       In the late 1990's MAGI instituted what it called a Retail Sales Policy (RSP).

23

24   Basically, the policy required dealers (including Counter-claimants) to sell products at

25   the minimum price dictated by MAGI. Dealers were not permitted to sell items below

26   the price fixed by the RSP, and absolutely no discounting of any sort (including offers of

27   free shipping or free product with purchase) was allowed under the policy. In short,

28

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1025
(408) 298-7120

Exhibit 2
Page 37

JUN.18.2004   4:42PM   ROBINSON & WOOD INC.                    NO.797    P.25/33

1    MAGI was attempting to enforce a minimum price maintenance program. Such

2    programs are a form of price fixing, and as such are a *per se* violation of the Sherman

3    Act. (*Business Electronics v. Sharp Electronics* (1988) 485 U.S. 717, 724 , 108 S.Ct.

4    1515, 1519-1520.)

5

6        When a manufacturer's actions go beyond mere announcement of his policy and

7    the simple refusal to deal, and he employs other means which effect adherence to his

8    resale prices, he has put together a combination in violation of the Sherman Act and is no

9    longer protected by the Colgate doctrine. (*United States v. Parke, Davis & Co.* (1960)

10    362 U.S. 29, 44 , 4 L.Ed.2d 505, 515, 80 S.Ct. 503.)

11

12        In this case, MAGI announced its prices, but went beyond a mere announcement

13    and refusal to deal in several ways. First, the RSP was not a unilateral fixed price. It

14    was a price below which dealers were not supposed to sell images, but dealers were

15    encouraged to sell items for whatever they felt they were worth as long as the price was

16    at or above the price dictated by the RSP. In this way, MAGI was soliciting the Dealers'

17    agreement to fix prices above a certain amount, and allowing for price variations. MAGI

18    was not simply announcing the price and refusing to deal with those who did not adhere

19    to the unilaterally fixed price. Importantly, MAGI did not enforce the RSP equally to all.

20    Some dealers and other retailers were permitted to discount product.

21

22        MAGI further violated the Sherman Act when it agreed to allow discount

23    merchants, for example Tuesday Morning, to sell <u>limited edition</u> products for prices

24    much lower than the minimum price the dealers were obligated to charge. This

25    demonstrates that Media Arts' did not simply announce a price at which all retailers were

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

24

Exhibit 2
Page 38

FEB. 03. 2004   4:42PM   ROBINSON & WOOD INC.                    NO. 797    P. 26/33

1  obligated to sell its merchandise, it engaged in bargaining with certain retailers to the

2  detriment of the dealers.

3

4      That MAGI did not apply its RSP equally to all retailers it dealt with created an

5  illegal restraint of trade.  Through the dealer agreements, Media Arts forced Signature

6  Dealers to purchase a certain amount of inventory.  Those were guaranteed sales for

7  Media Arts.  Then Media Arts told those Signature Dealers that they were not allowed to

8  discount and were obligated to sell Kinkade products at a certain minimum level.  MAGI

9

10  then turns around and secures sales above and beyond its "guaranteed" sales by selling

11  limited edition items to discounters and allowing those discounters to significantly

12  undercut the prices the Signature Dealers were allowed to charge.

13

14      In effect, through its deals with discounters whereby discounters were permitted

15  to sell items at very low prices, MAGI was making it impossible for dealers to sell to

16  their customers the product they were obligated to buy from MAGI.  Moreover, while

17  discounters were allowed to order certain images and were not bound by MAGI's

18  "automatic" requirements, nor bound by MAGI's requirement that 60% of all orders be

19

20  for "gallery proof product", the discounters were permitted to order product they

21  believed they could sell, without being hamstrung by requirements that they accept

22  merchandise they know they will not be able to sell.  No matter what an individual

23

24  Signature Dealer believed he could sell in his store, he was obligated to purchase 3 of

25  every limited edition item MAGI could put out.  To make matters worse, dealers could

26  not even discount the slow moving product they had in their inventory; they were simply

27  stuck with it.  The discounters were not so limited.  MAGI's scheme to saddle dealers

28

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

25

Exhibit 2
Page 39

1    with unmovable product at un-sellable prices was a clear restraint of trade and violation

2    of the Sherman Act.

3        F. Anti-Trust Violations – Clayton Act

4        Media Arts also engaged in price discrimination proscribed under the Clayton

5    Act, as amended by the Robinson-Patman Act (15 USC §13.)  In this case, MAGI's sale

6    to deep discounters such as Tuesday Morning and Hobby Lobby constituted a secondary-

7    line price discrimination.  A secondary-line price discrimination occurs when a seller's

8    discrimination impacts competition among the seller's customers, i.e. the favored

9    purchasers and the disfavored purchasers.  *(Texaco, Inc. v. Hasbrouck* (1990), 496 U.S.

10   543, 558 n. 15.)

11       In this case, the discrimination in price was between Counter-claimants and the

12   bargain basement discounters to whom MAGI sold items.  Although the exact prices paid

13   by the discounters to Media Arts for the product is not known at this time (due to the fact

14   that MAGI has produced no documents), it is reasonable to assume that the price paid by

15   the discounters was significantly less than the prices charged to Counter-claimants

16   because the discounters were *selling* the items for less than Counter-claimants were

17   *purchasing* them from MAGI.

18       In order to establish a violation of the Act, Counter-claimants are obligated to

19   show that 1) the seller's sales were made in interstate commerce; 2) the seller

20   discriminated in price as between the two purchasers; 3) the product sold to the

21   competing purchaser was of the same grade and quality; 4) and that the price

22   discrimination had a prohibited effect on competition. *(Id* at 556.)

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 05113-1016
(408) 298-7120

26

Exhibit 2
Page 40

1    In this case, it is unlikely MAGI will dispute that the sales occurred in interstate

2    commerce. MAGI is located in California, Counter-claimants are located in Georgia,

3    and the discounters to whom MAGI sold are located all over the country. As discussed

4    above, because of the lack of discovery in this matter counter-claimants do not know the

5    exact prices charged to the discounters by MAGI, but it is a reasonable inference, and

6    Counter-claimants expect witness testimony to reveal, that the amount was different from

7    that charged to Counter-claimants. Within the meaning of the Clayton Act, price

8

9    discrimination is "merely a price difference." (*Id* at 559.)

10

11    The first point of contention is likely to be the question of whether the items sold

12    to the discounters were of the same grade and quality as the product sold to Counter-

13    claimants. Limited edition prints are the product at issue in this case. The items sold to

14    the discounters, and the items sold to Counter-claimants at a higher price were limited

15    edition. There is no difference in the manufacturing process or the quality of the images.

16

17    Media Arts may attach different labels to the images (i.e. "studio proof", "gallery

18    proof", etc.) but these marketing techniques are not sufficient to create products of

19    different grade and quality. As the Supreme Court has observed "labels do not

20    differentiate products for the purpose of determining grade or quality, even though the

21    one label may have more customer appeal and command a higher price in the

22    marketplace from a substantial segment of the public." (*FTC v. Borden* (1966) 383 US

23    637, 640.)

24

25    The proscribed anti-competitive effect of MAGI's sale to the discounters was the

26

27    complete inability of Counter-claimants to compete with the discounters. The

28

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-3016
(408) 206-7120

27

Exhibit 2
Page 41

FEB. 16. 2004   4:43PM    ROBINSON & WOOD INC.                    NO. 797    P. 29/33

1   discounters were able to undersell Counter-claimants for two reasons, the first is the

2   simple fact of the price discrimination. The discounters paid less for the merchandise

3

4   **and** did not have the burdens of required purchases placed upon them, and were therefore

5   able to offer much lower prices than Counter-claimants were able to offer. The second

6   reason was MAGI's Retail Sales Policy, which forbade, on penalty of termination,

7

8   Counter-claimant from selling items for less than the price listed by MAGI. Even if

9   Counter-claimants could, from a business economics perspective, match the prices of the

10  discounters, MAGI's RSP prevented them from doing so.

11      Finally, 15 USC §15 provides for the recovery of treble damages, costs, and

12  attorney's fees when a claimant is injured by reason of anything forbidden by the anti-

13
14  trust laws. In this case, Mr. Kayne's damages, before enhancements, costs, and

15  attorneys' fees, are approximately $6 million dollars.

16      ## H. Unfair Business Practices (B&P §17200):

17
18      MAGI engaged in unfair business practices in violation of California Business

19  and Professions Code §17200 et. seq. By its terms, the UCL prohibits as unfair

20  competition "any unlawful, unfair or fraudulent business act or practice." ( Bus. & Prof.

21  Code, § 17200.) The statute has been found to prohibit "wrongful business conduct in

22  whatever context such activity might occur." (*Barquis v. Merchants Collection Assn.*

23
24  (1972) 7 Cal. 3d 94, 111)

25      To meet the "unlawful" prong, any law, civil or criminal, state or federal, can

26  serve as the predicate. (*State Farm Fire & Casualty Co.*, *supra*, 45 Cal.App.4th at 1102-

27  1103; *Roskind v. Morgan Stanley Dean Witter & Co.* (2000) 80 Cal.App.4th 345, 352.)

28

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

28

Exhibit 2
Page 42

1  In this case, Media Arts' unlawful practices include fraud, misrepresentation, and

2  violations of California's Franchise Investment Law, as well as violations of Anti-Trust

3  laws.

4

5  Even if Media Arts is found to have been in compliance with the franchise and

6  anti-trust laws, under the UCL, certain "lawful" conduct may still be unfair and thereby

7  actionable.  In *Cel-Tech Communications v. L.A. Cellular* (1999) 20 Cal.4th 163, the

8  Supreme Court concluded that the word "unfair" in the statute reaches any conduct that

9  significantly threatens or harms competition, even if the conduct is not specifically

10  prohibited by another law.  An unfair business practice occurs "when it offends an

11  established public policy or when the practice is immoral, unethical, oppressive,

12  unscrupulous or substantially injurious to consumers." (*People v. Casa Blanca*

13

14  *Convalescent Homes, Inc.* (1984) 159 Cal.App.3d 509, 530.)  MAGI's immoral,

15  unethical, and oppressive business practices permeated its dealings with Counter-

16  claimants.

17

18

19

20

21

22

23

24

25  ///

26  ///

27  ///

28

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

29

RESPONDENT / COUNTER CLAIMANTS' ARBITRATION BRIEF

Exhibit 2
Page 43

1

2                                          III.

3                                  CONCLUSION

4        The simple thread running through the entire complex relationship between Mr.

5   Kayne and Media Arts is this: Media Arts was continually and intentionally dishonest in

6   its dealings with Counter-claimants, and these acts were a legal cause of the ruin of Mr.

7   Kayne's business.  He asks this panel to hold Media Arts accountable for its actions.

8

9

10       Dated: February 16, 2004

11

12                                      ROBINSON & WOOD, INC.

13

14                                      By_____

15                                         CHRISTIAN B. NIELSEN

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 98113-1016
(408) 298-7120

                                          30

                                          Exhibit 2
                                          Page 44

FEB.16.2004   4:44PM   ROBINSON & WOOD INC.                    NO.797   P.32/33

PROOF OF SERVICE

Short Title:  Media Arts Group v. L&M Corporation

American Arbitration Association Case No. 74-181-02154-02 SAT

I, JESSICA A. MAHONEY declare:

I am a citizen of the United States and a resident of the County of Santa Clara.  I am over the age of eighteen (18) years and not a party to the within entitled action.  I am employed by Robinson & Wood, Inc., 227 North First Street, San Jose, California, 95113, in the office of a member of the bar of this court at whose direction the service was made.  I am readily familiar with Robinson & Wood, Inc.'s practice for collection and processing of documents for delivery by way of the service indicated below:

      ( )    [BY MAIL] By consigning such copy in a sealed envelope, First Class postage fully prepaid, in the United States Postal Service for collection and mailing

      (⊗)    [BY OVERNIGHT DELIVERY] By consigning such copy in a sealed envelope to an overnight courier for next business day delivery

      ( )    [BY HAND-DELIVERY] By consigning such copy in a sealed envelope to a messenger for guaranteed hand-delivery

      (x)    [BY FACSIMILE TRANSMISSION] By consigning such copy to a facsimile operator for transmittal

On February 16, 2004 in accordance with ordinary business practices at Robinson & Wood, Inc., I caused to be served: RESPONDENT / COUNTER-CLAIMANTS' ARBITRATION BRIEF in the manner identified above on the person(s) listed below:

| | |
|---|---|
| Hon. Carl West Anderson<br>15 Sotelo Avenue<br>Piedmont, CA 94611<br>Fax: 510-420-8643 | Panel Arbitrator |
| Zela G. Claiborn, Esq.<br>70 Twain Avenue<br>Berkeley, CA 94708<br>Fax: 510-704-0441 | Panel Arbitrator |
| Thomas Dandurand | Panel Arbitrator |

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

2

[KEYBOARD]

Exhibit 2
Page 45

FEB.16.2004   4:44PM   ROBINSON & WOOD INC.                         NO.797     P.33/33

1    425 Market Street, Suite 2200
     San Francisco, CA 94105
2    Fax: 415-332-4421

3    Ms. Shannon Troup                          **Case Manager**
     American Arbitration Association
4    6795 North Palm Avenue, Second Floor
     Fresno, CA 93704
5    Fax: 559-490-1919

6    Dana N. Levitt                             **Attorney for Claimant**
     Alschuler, Grossman, Stein & Kahan, LLP
     The Water Garden
7    1620 -26th Street
     4th Floor-North Tower
8    Santa Monica, CA 90404-4060
     Fax: 310-907-2000
9

10   Maurice Tynes, Esq.                        **Co-Counsel for Respondents**
     4902 Ihles Road
     Lake Charles, LA 70605
11   Fax: 337-479-1287

12   I declare under penalty of perjury that the foregoing is true and correct.  Executed February 16,
13   2004 at San Jose, California.

14                                    By _____
15                                         JESSICA A. MAHONEY

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINSON & WOOD
INC.
227 NORTH FIRST STREET
SAN JOSE, CA 95113-1016
(408) 298-7120

3

[KEYBOARD]

Exhibit 2
Page 46

FEB.16.2004   4:35PM   ROBINSON & WOOD INC.                    NO.797   P.1/33

**FILE COPY**

## ROBINSON & WOOD, INC.
### Attorneys at Law
227 North First Street
San Jose, California  95113
Telephone: (408) 298-7120
Facsimile: (408) 298-0477

**RECEIVED**
FEB 1 7 2004
ALSCHULER GROSSMAN
STEIN & KAHAN LLP

---

**DATE:**    February 16, 2004                    **NUMBER OF PAGES:** 33
(Including Cover Page)

**TO   :**    Dana Levitt, Esq.                    **FAX NUMBER:** (310) 907-2000
Shannon Troup                                      (559) 490-1846

**RE   :**    Media Arts v. Kayne

**FROM:**    Jessica Mahoney
Our File # 13702

---

**MESSAGE:**

---

THE INFORMATION CONTAINED IN THIS FACSIMILE IS CONFIDENTIAL AND MAY ALSO BE ATTORNEY-PRIVILEGED. THE INFORMATION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THE FACSIMILE IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ADDRESS ABOVE VIA THE U.S. POSTAL SERVICE. THANK YOU.

**IF YOU DO NOT RECEIVE ALL PAGES OF THIS FAX,
PLEASE CALL (408) 298-7120 IMMEDIATELY. THANK YOU.**

Exhibit 2
Page 47

# AMERICAN ARBITRATION ASSOCIATION

## COMMERCIAL ARBITRATION PANEL

In the Matter of the Arbitration between:

> The Thomas Kinkade Company
> (formerly Media Arts Group, Inc.),
> > Claimant and Cross-Respondent

> and

> David Kayne and Tracey Kayne,
> > Respondents,
> and

> Kayne Art Galleries of Georgia, Inc.,
> > Respondent and Corporate Cross-Complainant

AAA Case Number: 74 181 02154 02 SAT

## REASONS FOR AWARD

**Claimant's Demand:**

1. Claimant seeks an Award of $623,672.00, which represents the value of products sold to Respondents together with finance charges. It is undisputed that Respondents voluntarily ordered these products (i.e., they were not required to purchase under the automatic plan), they received them, and they have not paid for them. It is also undisputed that Respondents agreed to pay finance charges in the amount of 1.5% per month. Respondents allege that Claimant is not entitled to recover on its contract because the contract, or at least several provisions thereof, is unconscionable and Claimant has unclean hands.

2. The contract is not unenforceable due to unconscionability. The circumstances of entering this relationship were not unequal, whereby one side is forced to accept terms with which it disagrees. Mr. Kayne had the chance to review the terms of the Dealer Agreement, because they were discussed at TKU. He never complained about any of its provisions until this lawsuit. The contract, itself, is not one-sided. On its face it sets forth the responsibilities of both dealers and Claimant. It even allows Respondent to terminate after one year, but provides that Claimant may not terminate until the end of

Exhibit 3
Page 48

three years. In short, Respondent entered this contract for business reasons, thought he could profit by so doing, and was justified in this belief for several years.

3.  Respondent conceded on direct examination that his balance due after deducting his claimed credits was $484,879.38. He seeks credits in the amount of $88,305.00 as follows:

(a) $31,950 for purchase of "Victorian Christmas" from another dealer, Pat Kinkade, on the secondary market. Respondent had a customer for this painting, but the customer refused to purchase because Claimant's catalog recorded the number of editions retired at 9, and the Certificate of Authenticity attached to the painting designated it as "3/20." Claimant was negligent in not including in its catalog and/or the Certificate of Authenticity the notation that the image was originally intended for 20 editions but retired at 9. The evidence is uncontradicted that Respondent lost the sale because of this discrepancy. However, there is no evidence that the image was not sold later. If Respondent still has this image he may receive credit for it upon transfer to Claimant.

(b) $8,228, representing post termination interest on balance at termination. Respondent contracted to pay these finance charges on his outstanding balance and is NOT entitled to this credit.

(c) $11,000, representing one-half of finance charges on inventory in connection with a downgrade. At the time, in 2001, the parties apparently reached agreement by splitting the finance charges between them. Respondent may not now re-open those negotiations and is NOT entitled to this credit.

(d) $9,336, representing the promised 5% discount for the 2002 promotion. The evidence is uncontradicted that this promise was made and not kept. Respondent IS entitled to this credit.

(e) $27,781, representing Claimant's obligation to pay 5% of inventory purchases for cooperative advertising. The evidence is uncontradicted that this was never paid. Respondent IS entitled to this credit.

Thus, Respondent is entitled to a total credit of $37,117.00 and to an additional credit of $31,950.00 if he transfers "Victorian Christmas" to Claimant. Therefore, Claimant is entitled to a judgment against Respondent in the amount of $554,605.00 together with "Victorian Christmas" or, in the alternative, a judgment in the amount of $586,555.00 without that image.

4.  No evidence was introduced that Respondent owed money to Claimant "under certain real estate agreements," so Claimant takes nothing by this demand.

5.  Claimant seeks an injunction and damages in the amount of $1.7 million for trademark infringement. The evidence is uncontradicted that following termination Respondent continued to use Claimant's trademark "Thomas Kindade Signature Gallery" at several locations. After his termination as a signature gallery dealer he was not entitled to do so, and an injunction should issue to prevent his continued infringement. However, Claimant's proof of damages for this claim falls woefully short, and Claimant is not entitled to any monetary damages. Because Claimant chose not to buy back Respondent's Kinkade inventory, Respondent may continue to sell such images, and he

Exhibit 3
Page 49

may refer to the artist, Thomas Kinkade, in selling those products without infringing any trademark.

6. Claimant seeks to hold Respondent David Kayne and Respondent Tracey Kayne personally liable on its Demand. David Kayne signed a personal guarantee on October 2, 2001 in applying for a greater amount of credit (see Ex. 76), verified his signature on cross-examination and admitted that he "now" understands this obligation. He is, therefore, liable on this judgment together with Corporate Respondent Kayne Art galleries of Georgia, Inc., jointly and severally. No evidence supports holding Respondent Tracey Kayne individually liable, and judgment should be entered in her favor, and she should be entitled to costs, if any.

**Corporate Respondent's Counterclaim:**

7. Respondent's 39 paragraph counterclaim contains some 16 major factual conclusions, all of which were vigorously contested in this arbitration, and it contains at least as many separate causes of action, including breach of the covenant of good faith and fair dealing, unfair competition, anti-trust, RICO, Federal Trade Commission Rules & Regulations, illegal termination, tortuous interference with contract, tortuous interference with business relations, "tortuous interference with business expectancy-inspective economic advantage (sic)," fraudulent disclosure, price discrimination, etc..

8. By the close of evidence Respondent's causes of action had been pared to six: (1) the dealer agreement is unconscionable (so its provisions barring consequential and punitive damages is void); (2) Sherman Anti-trust Act & Clayton Act; (3) Unfair Trade Practices Act; (4) Interference with Prospective Economic Advantage; (5) Fraud; and (6) California franchise Act.

9. Respondent has not proven by a preponderance of evidence the elements of even one of these causes of action. For example, absolutely no evidence was introduced concerning what disclosures Claimant failed to make in violation of the California Franchise Act. And no argument was advanced concerning how the Clayton Act or Sherman Anti-trust Act were violated.

10. The dissent finds that Claimant's conduct violated the "covenant of fair dealing" by impliedly promising Respondent a long-term business relationship; yet, the contract itself plainly authorizes Claimant to terminate after 3 years. The dissent also finds that Claimant unfairly undercut the prices it required dealers to charge and concludes this was an unfair business practice. However, no distinction is made between limited edition paper and limited edition canvas. The evidence is uncontradicted that signature dealers preferred canvas over paper, that they actually ordered very little paper, and that the discounting involved limited edition paper products and not canvas. Did the signature dealers rush to take advantage of the paper discounts when they were offered? The evidence does not so establish. Finally, the dissent finds that Claimant intentionally interfered with Respondent's business relationships with his art clientele in Atlanta. Yet, not one shred of evidence points to even one customer with whom Claimant interfered.

Exhibit 3
Page 50

11. Even assuming the provisions of the dealer agreement which bar compensatory and punitive damages is unconscionable (which we do not), and further assuming that Claimant's conduct amounted to a violation of the unfair Business Practices Act (which we do not), the evidence does not establish that claimant's conduct *caused* any damages to Respondent, let alone the $3.5 million claimed.

12. The chief evidence relied upon by Respondent to prove its causes of action for violation of the Sherman Act, Clayton Act, California Unfair Trade Practices Act, and Interference with Prospective Economic Advantage is the sale of limited edition paper products to Red Tag and the ultimate sale of these images at greatly discounted prices to the public by Hobby Lobby and Tuesday Morning stores. These sales occurred in mid-December of 2001. No evidence links this discount sale to any impact upon Respondent's bottom line. In fact, the evidence demonstrates that Respondent had begun losing money, on a gallery by gallery analysis, as far back as the year 2000, and that this trend was not exacerbated by the sale.

13. Mr. Spindler, Claimant's very impressive accounting expert, testified that the figures for any gallery do not support a conclusion that profits were reduced or losses increased due to the discount sale of December 13, 2001. Spindler analyzed Respondent's business on a gallery-by-gallery basis and found the downturn for some actually began as early as the year 2000. Immediately after the sale the downturn continued, and continued at about the same rate. He testified that "...the galleries had declining sales individually basically year after year after year." (RT p.1678, lines 9-10 and Ex. 146) [particularly illustrative of this is Perimeter Mall, which showed a decline in every year following 1999 as follows: $82,920 (2000), $57,164 (2001), $5,355 (2002), and $122,274 (2003); interestingly its least loss was in year following the allegedly wrongful sale]. The revenue figures simply do not support a conclusion that Claimant's conduct in discounting caused any loss to Respondent. 2002 continued a downturn already begun in 2000. This downturn is consistent with the universal downturn of the economy; the evidence is undisputed that discretionary purchases of items like art decline in bad economic times.

14. Furthermore, Respondent's conduct immediately following the December 13, 2001 sale speaks louder than Mr. Kaynes' testimony, and demonstrates that he did not consider his business severely impacted by Claimant's conduct: from January to March of 2002 Respondent ordered $419,867.18 worth of Kinkade products, and it ordered another $685,358.45 during the next 6 months (See Ex. 144). Seven months after the Tuesday Morning sale Respondent's Vice President, Chad Paydo, was prepared for "a good season" and wanted to buy $900,000 worth of Kinkade product. He conceded that the good images sold after the Tuesday Morning sale, and that "we were very optimistic." Respondent's conduct and its officer's attitude belie its assertion that Claimant "destroyed the Kaynes' territorial and price-point relationship with potential retail customers..." (See Respondent's post-hearing brief at p.19).

15. Even if Respondent could prove Claimant's conduct somehow harmed its business, Respondent has failed to prove any damages. Its expert's opinion that Respondent

Exhibit 3
Page 51

suffered losses in excess of $6 million was severely impeached: Mr. Davis used questionable and untested assumptions, combined alternative measures for calculating damages (losses due to continued operations + losses due to closing galleries + loss of return on investment), admitted computation errors under oath, used the wrong damage period (he did not even read the dealer agreement authorizing Claimant the right not to renew after 3 years), and did not consider unemployment and or market data concerning its effect upon discretionary purchases—to identify just the most flagrant of errors. That Respondent, in closing argument, reduced its demand for compensatory damages to $3.5 million speaks volumes about the persuasiveness of its expert.

16. In summary, analysis of each cause of action and the evidence advanced to support it does not establish liability for a single claim. To so find is not to condone the several inappropriate business decisions made by Claimant during the relationship of which Respondent now complains. Respondent is, however, not entitled to compensatory, punitive and/or treble damages on any of its counterclaims.

Dated:    7-10-04                    _____
                                     Carl West Anderson, Presiding Arbitrator


          7.6.04                     _____
                                     Zela G. Claiborne, Arbitrator

1  Judge Thomas Dandurand Retired
   425 Market Street Suite 2200
2  San Francisco, CA 94105
   Phone: 415-955-0503

3

4                    AMERICAN ARBITRATION ASSOCIATION

5

6  In the Matter of the Arbitration between:

   The Thomas Kinkade Company        ) Case No.: 741810215402SAT
7  (formerly Media Arts Group, Inc), )
          Claimant and Cross-Respondent ) Concurring And Dissenting Decision
8                                     )          Of Judge Dandurand
                                      )
9              And                    )
                                      )
10  David Kayne; Tracey Kayne;        )
    Kayne Art Galleries of Georgia Inc., )
11     Respondents and Cross-Complainants )
                                      )
12                                    )
                                      )
13  ───────────────────────────────────

14       The undersigned arbitrator concurs with the majority decision to award

15  the sum of $588,555.00 to the Claimant Media Arts against the Respondent

16  David Kayne and Kayne Galleries.

17       Mr. Kayne admitted in his testimony that he owed Media Arts in excess

18  of $484,000.00 for artwork he received and as yet, has not paid for. The

19  arbitrators concur that the correct amount owing to Media Arts is $588,555.00

20  rather that the amount stated by Mr. Kayne.

21       I agree that Media Arts is entitled to injunctive relief against the

22  Kayne Galleries for the use of the Signature Gallery Trademark and logo.

23       Mr. Kayne testified that he continues use the Kincade Trademark logo

24  and to operate his galleries under the name "Thomas Kincade" even though he

25  has been terminated as a dealer by Media Arts.

                                    - 1

Exhibit 4
Page 53

1    Further I agree that Media Arts has failed to establish any liability

2    on the part of Tracey Kayne and I believe she is entitled to her costs.

3    Therefore, I concur with the other arbitrators that the Respondent is

4    indebted to the claimant for the unpaid artworks and that Kayne Galleries

5    should cease the use of the Kincade Trademarks.

6    However, I respectfully disagree with the majority rejection of Mr.

7    Kayne's counterclaim. I believe Mr. Kayne is entitled to damages that

8    resulted to his Gallery business caused by of the conduct of Media Arts.

9    The dealer agreement between Kayne and Media Arts was a one-sided

10    adhesion contract and not an arms length transaction. I believe that certain

11    provisions in the dealer agreement are unconscionable and therefore

12    unenforceable. However, Mr. Kayne appears to have accepted its terms and

13    operated under the agreement for several years without any complaints until

14    Media Arts began to saturate his exclusive territory with discounted

15    products.

16    The fact that Mr. Kayne acquiesced with this adhesion agreement does

17    not relief Media Arts of its obligation to deal fairly with Kayne.

18    It is my opinion that the conduct of Media Arts constituted a violation

19    of the "covenant of fair dealing" that is implied in this dealer agreement. I

20    believe Media Arts impliedly promised Kane a long-term business relationship

21    by their conduct. Media Arts urged Kayne to open several galleries and

22    assisted him in committing to long-term leases at various locations. Media

23    Arts also promised him an exclusive territory and led him to believe that

24    Media Arts would assist him in everyway possible to be a success in these

25    galleries. Media Arts by their statements and conduct implied they would not

- 2 -

Exhibit 4
Page 54

1  compete with their dealers, even thought the agreement authorized Media Arts

2  to do whatever they wanted.

3      Its appears that after a few years, Media Arts bottom line on Wall

4  Street began to wane and the Claimant wanted to increase its cash flow in

5  order to keep its stock value high. Therefore, it decided to discount its

6  products and saturate the art market with Kincade images. No doubt, this had

7  a serious effect upon Mr. Kayne's business.

8      Even though the dealer agreement did authorize sales of other products

9  by Media Arts in a dealer's territory, the manner in which Media Arts treated

10  the Kayne galleries constituted an unfair business practice, and violated the

11  covenant of good faith and fair dealing.

12      Media Arts was more concerned with its profits and Wall Street then it

13  was with its dealers. Media Arts was not trying to assists the dealers as

14  they led the dealers to believe. It was unfairly undercutting the prices the

15  dealers were bound to charge under the dealer agreement.

16      This was an unfair business practice in my opinion. You don't convinced

17  a dealer to enter the art business and a long term lease, require him not to

18  sell your goods below a certain price, and then allow discounter's to compete

19  in his territory at greatly reduced prices for similar products. This is

20  unfair and a violation of the covenant. Media Arts was selling its dealers

21  down the river and more interested in its bottom line then helping the

22  dealers, and treating then fairly.

23      Further, I believe Media Arts intentionally interfered with Kayne's

24  business relationships with his art clientele in the Atlanta area by allowing

25  discounters to undercut Kayne's prices and saturate his so-called exclusive

- 3 -

Exhibit 4
Page 55

1  territory with cheaper images. This discounting was done with a conscious

2  disregard of the effect it would have on Kayne's business.

3

4      I believe Media Art destroyed Mr. Kayne's market by its decision to

5  discount Kincade art. I would award Kayne the damages to his business caused

6  by the conduct of Media Arts.

7

8

9

10  Dated this  22nd day of June, 2004

11                                                  Judge Thomas Dandurand
                                                       Arbitrator
12

13

14

15

16

17

18

19

20

21

22

23

24

25

— 4 —

Exhibit 4
Page 56



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

John M. Bishop
Vice President, Case Management Center

6795 North Palm Ave, 2nd Floor, Fresno, CA 93704
telephone: 559-490-1900 facsimile: 559-490-1919
internet: http://www.adr.org/

# FAX

DATE: TUESDAY, JULY 13, 2004
TO:
Jonathan R. Goldblatt, Esq.
Dana Levitt, Esq.
Alschuler Grossman Stein & Kahan LLP
The Water Garden
1620 26th Street
Fourth Floor, North Tower
Santa Monica, CA 90404-4060

Maurice L. Tynes
Maurice L. Tynes & Associates
4902 Ihles Road
Lake Charles, LA 70605

Archie Robinson, Esq.
Christian B. Nielsen, Esq.
Robinson & Wood, Inc.
227 N. First St.
San Jose, CA 95113

FAX NUMBER:      (310) 907-2000 (Goldblatt & Levitt)
                 (337) 479-1287 (Tynes)
                 (408) 298-0477 (Robinson & Nielsen)

FROM: SHANNON A. TROUP, CASE MANAGER

NUMBER OF PAGES:    15 pages including cover

Re: 74 181 02154 02 SAT
    Media Arts Group, Inc.
    VS
    David Kayne
    and
    Tracey Kayne
    and
    Kayne Art Galleries of Georgia, Inc.

THIS FAX TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE PERSON TO WHOM IT IS
ADDRESSED. IT MAY CONTAIN INFORMATION THAT IS CONFIDENTIAL, PRIVILEGED OR
OTHERWISE EXEMPT FROM DISCLOSURE. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE
PERSON AUTHORIZED TO DELIVER THIS FAX TO THE INTENDED RECIPIENT, YOU ARE HEREBY
NOTIFIED THAT ANY DISSEMINATION OF THIS FAX IS PROHIBITED. IF YOU HAVE RECEIVED THIS
FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AT THE NUMBER LISTED
ABOVE AND RETURN THE ORIGINAL FAX TO US BY FIRST CLASS MAIL AT THE ABOVE ADDRESS.

Exhibit 4
Page 57

# AMERICAN ARBITRATION ASSOCIATION

## COMMERCIAL ARBITRATION PANEL

In the Matter of the Arbitration between:

The Thomas Kinkade Company
(Formerly Media Arts Group, Inc.),
                              Claimant and Cross-Respondent

        and

David Kayne and Tracey Kayne,
                              Respondents,
        and

Kayne Art Galleries of Georgia, Inc.,
                              Respondent and Corporate Cross-Claimant

AAA Case Number: 74 181 02154 02 SAT

## AWARD

Claimant seeks by its Demand for Arbitration filed December 10, 2002, the sum of $623,672.00 from Respondents, which sum represents the value of art ordered by and delivered to Respondents but not paid for by Respondents. Claimant also asserts a claim for trademark infringement for which it seeks $1.7 million. Respondents claim the Dealer Agreement is an unconscionable adhesion contract and unenforceable and that they only owe Claimant's $484,879.38 on their unpaid account. Respondents seek compensatory damages on their Cross-Complaint in the sum of $3.5 million on six causes of action: Restraint of Trade (Sherman Act), Price Discrimination (Clayton Act), Unfair Practices Act (Business and Professions Code, Sec.17001 et.seq.), Tortious Interference With Prospective Economic Advantage, Fraud, and Violation of the California Franchise Act. In addition, Respondents seek to have their compensatory damages trebled, or in the alternative, seek punitive damages of $3 million.

This matter came on for arbitration hearings on February 23, 24, 25, 26, and 27, 2004 and on May 5, 6, 7, 12, and 13, 2004 before arbitrators Zela G. Claiborne, Judge Thomas Dandurand (Ret.) and Presiding Justice Carl West Anderson (Ret.). Claimants were represented by Dana N. Levitt, Esq. and Jonathan R. Goldblatt, Esq. of Alschuler Grossman Stein & Kahan LLP. Respondents were represented by Archie S. Robinson,

RECEIVED TIME  AUG. 31.  9:47AM

Ex. E-1

Exhibit 5
Page 58

Esq. and Christian B. Nielsen, Esq. of Robinson & Wood, Inc. and by Maurice L. Tynes, Esq. of Maurice L. Tynes & Associates, PLC. Post hearing briefing was received simultaneously from both parties on June 7, 2004. An Interim Award was issued on July 6, 2004. Motions for Costs and to Tax Costs were heard on July 9, 2004 and the matter was submitted for decision.

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Paragraph 22 of Media Arts Group, Inc. Standard Terms and Conditions incorporated within the Signature Dealer Agreement for each Signature Gallery entered into between the parties and having been sworn and having heard the proofs and allegations of the parties, AWARD as follows:

1.  That judgment be entered in favor of Respondent Tracey Kayne on Claimant's Demand, Claimant having conceded that no evidence supports finding Tracey Kayne individually liable. The costs associated with Respondent Tracey Kayne's defense of this arbitration shall be borne by Claimant   Therefore, Claimant shall pay to Respondent Tracey Kayne the sum of $11,999.67 on account of costs.

2.  That judgment be entered in favor of Claimant and against Respondents David Kayne individually and Kayne Art Galleries of Georgia, Inc. in the amount of $588,555.00 on its Demand for payment for products ordered by and delivered to Respondents. Respondents are entitled to a credit of $31,950.00 on condition they transfer the image "Victorian Christmas" to Claimant within 30 days of the date of this Award.

3  On its Claim for Trademark Infringement Claimant is entitled to an injunction but no damages, proof of damages being insufficient. Respondent is forever enjoined from using the trademark "Thomas Kinkade Signature Gallery."

4.  Corporate Respondent has failed to establish by a preponderance of evidence its entitlement to damages on any of the causes of action asserted in its Counterclaim. Judgment is entered in favor of Claimant and Cross-Respondent The Thomas Kinkade Company on all claims alleged by Respondent and Cross-Claimant Kayne Art Galleries of Georgia, Inc. in its Counterclaim.

5.  Each side is to bear its own attorneys' fees.

6.  Pursuant to Rules 49, 50 and 51 of the American Arbitration Association Commercial Arbitration Rules Claimant is entitled to be reimbursed its costs of suit by Respondents. Therefore, Respondents David Kayne and Kayne Art Galleries of Georgia, Inc  shall pay to Claimant the sum of $35,879.86 on account of costs.

Ex. E-2

Exhibit 5
Page 59

SEP  1. 2004  2:50PM     AMERICAN-ARBITRATION          NO. 1712   P. 7/7
RECEIVED TIME  AUG 30.  4:25PM

-74 181 02154 02 SAT
Page 3

7. The administrative fees and expenses of the American Arbitration Association ("the Association") totaling $23,500.00 shall be borne by Respondents David Kayne and Kayne Art Galleries of Georgia, Inc. The compensation and expenses of the arbitrators totaling $151,680.00 shall be borne $58,600.00 by Claimant, The Thomas Kinkade Company (Formerly Media Arts Group, Inc.), and $93,080.00 by Respondents, David Kayne and Kayne Art Galleries of Georgia, Inc. Therefore, Respondents David Kayne and Kayne Art Galleries of Georgia, Inc. shall pay to Claimant, Thomas Kinkade Company (Formerly Media Arts Group, Inc.) the additional sum of Thirty Nine Thousand One Hundred Fifty Dollars, and Zero Cents ($39,150.00), representing those amounts previously advanced to the Association by Claimant, Thomas Kinkade Company (Formerly Media Arts Group, Inc.). Furthermore, Respondents David Kayne and Kayne Art Galleries of Georgia, Inc. shall pay to the Association the additional sum of Eight Thousand Eight Hundred Eighty Dollars and Zero Cents ($8,880.00), representing amounts still due to the Association and/or the arbitrators.

This Award is in full settlement of all claims submitted to this arbitration. All claims not expressly granted herein are, hereby, DENIED.

Dated: August 27, 2004

Carl West Anderson, Presiding Arbitrator

Zela G. Claiborne, Arbitrator

Aug. 29 2004 04:49PM P3          FAX NO. :518 784 8441.          FROM :CLAIBORNE

Ex. E-3

Exhibit 5
Page 60

SEP 1 2004 2:49PM    AMERICAN~ARBITRATION                    NO 1/12  P. 0/7
                                                1-510-420-9643              P. 4

7. The administrative fees and expenses of the American Arbitration Association ("the Association") totaling $23,500.00 shall be borne by Respondents David Kayne and Kayne Art Galleries of Georgia, Inc. The compensation and expenses of the arbitrators totaling $151,680.00 shall be borne $58,600.00 by Claimant, The Thomas Kinkade Company (Formerly Media Arts Group, Inc.), and $93,080.00 by Respondents, David Kayne and Kayne Art Galleries of Georgia, Inc. Therefore, Respondents David Kayne and Kayne Art Galleries of Georgia, Inc. shall pay to Claimant, The Thomas Kinkade Company (Formerly Media Arts Group, Inc.) the additional sum of Thirty Nine Thousand One Hundred Fifty Dollars and Zero Cents ($39,150.00), representing those amounts previously advanced to the Association by Claimant, The Thomas Kinkade Company (Formerly Media Arts Group, Inc.). Furthermore, Respondents David Kayne and Kayne Art Galleries of Georgia, Inc. shall pay to the Association the additional sum of Eight Thousand Eight Hundred Eighty Dollars and Zero Cents ($8,880.00), representing amounts still due to the Association and/or the arbitrators.

This Award is in full settlement of all claims submitted to this arbitration. All claims not expressly granted herein are, hereby, DENIED.

Dated: August 27, 2004

_Carl West Anderson_
Carl West Anderson, Presiding Arbitrator

_____
Zela G. Claiborne, Arbitrator

RECEIVED TIME  AUG 31  9·47AM

Ex. E-4

Exhibit 5
Page 61