1  CHARLES L. COLEMAN, III (CA. Bar No. 65496)
   ANDREW T. CAULFIELD (CA. Bar No. 238300)
2  HOLLAND & KNIGHT LLP
   50 California Street, 28th Floor
3  San Francisco, California  94111
   Telephone: (415) 743-6900
4  Facsimile: (415) 743-6910
   charles.coleman@hklaw.com
5  andrew.caulfield@hklaw.com

6  Attorneys for Plaintiff
   DAVID KAYNE
7

8  DANA N. LEVITT, PC (CA Bar No. 77180)
   CHARLES E. WEIR (CA Bar No. 211091)
9  JASON D. STRABO (CA Bar No. 246426)
   McDERMOTT WILL & EMERY LLP
10 2049 Century Park East, Suite 4110
   Los Angeles, CA 90067-3218
11 Telephone: (310) 277-4110
   Facsimile: (310) 277-4730
12 dlevitt@mwe.com
   cweir@mwe.com
13 jstrabo@mwe.com

14 Attorneys for Defendant
   THE THOMAS KINKADE COMPANY
15

16              UNITED STATES DISTRICT COURT

17            NORTHERN DISTRICT OF CALIFORNIA

18          SAN FRANCISCO DIVISION – E-FILING

19 DAVID KAYNE, an individual citizen    )  Case No.        C 07-4721 SI
   of Georgia,                           )  Related Case:   C 04-00186 SI
20                                        )
                    Plaintiff,            )  STIPULATION AND [PROPOSED]
21                                        )  ORDER *RE*: FIRST AMENDED
         vs.                              )  COMPLAINT AND MAINTAINING
22                                        )  DECEMBER 7 HEARING DATE ON
                                          )  MOTIONS TO DISMISS AND TO
23 THE THOMAS KINKADE COMPANY,            )  STRIKE
   formerly known as MEDIA ARTS          )  Hearing Date: December 7, 2007
24 GROUP, INC., a Delaware Corporation,   )  Hearing Time: 9:00 a.m.
                                          )  Courtroom: 10, 19th Floor
25                  Defendant.            )

26 //

27

28
   _____
                              - 1 -
   STIPULATION AND [PROPOSED] ORDER *RE*:              CASE NO. C 07-4721 SI
   1ST AMENDED COMPLAINT AND DECEMBER 7 HEARING

1    WHEREAS, on September 13, 2007, plaintiff David Kayne ("Plaintiff" or "Mr.

2    Kayne") filed this action in this Court, where it was initially designated as Case No.

3    C 07-4721 JF (RS), assigned to Judge Fogel of the San Jose Division of this Court;

4    and

5    WHEREAS, Plaintiff served the Complaint herein on defendant The Thomas

6    Kinkade Company ("TKC") as of September 14, 2007; and

7    WHEREAS, TKC filed a motion to dismiss Plaintiff's Complaint and also a

8    motion to strike certain paragraphs of the Complaint on October 4, 2007 and

9    initially noticed these motions to be heard before Judge Fogel on November 30,

10   2007; and

11   WHEREAS this Court, after accepting this as a related case, has re-set TKC's

12   motions for hearing on December 7, 2007; and

13   WHEREAS, Mr. Kayne intends to oppose TKC's motion to dismiss and most

14   of TKC's motion to strike, but wishes to make certain modifications and corrections

15   to the Complaint to reflect, *inter alia*, certain new facts, all as set out in a proposed

16   First Amended Complaint attached as Exhibit "A" which has the same paragraph

17   numbering as the initial Complaint; and

18   WHEREAS, the parties agree that the issues presented by TKC's previously-

19   filed motion to dismiss, as well as nearly all of the issues presented by TKC's

20   previously-filed motion to strike are not resolved by the amendments contained in

21   the First Amended Complaint and can be appropriately addressed by directing

22   TKC's motions toward the proposed First Amended Complaint instead of the initial

23   Complaint; and

24   WHEREAS, the parties wish to proceed, under the December 7 hearing date

25   established by the Court with respect to TKC's previously-filed motion to dismiss

26   and motion to strike;

27   //

28

-2-

1    NOW, THEREFORE, it is hereby stipulated as follows by and between Mr.

2    Kayne and TKC through their respective undersigned counsel:

3        1.    Plaintiff's First Amended Complaint, a copy of which is attached

4    hereto as Exhibit "1", may be filed upon approval by the Court and shall, after such

5    filing, supersede the original Complaint; and

6        2.    TKC's motion to dismiss and motion to strike set for hearing on

7    December 7 directed at Plaintiff's initial Complaint will instead be deemed to refer

8    to Plaintiff's First Amended Complaint, so that TKC's motions may be addressed on

9    December 7 without any delay resulting from the filing of the First Amended

10   Complaint.

11   Dated: October 26, 2007

12                                    Respectfully submitted,

13   HOLLAND & KNIGHT LLP              McDERMOTT WILL & EMERY LLP

14

15   _____          _____
     By:  Charles L. Coleman, III      By:  Charles E. Weir
16   Attorneys for Plaintiff           Attorneys for Defendant
     DAVID KAYNE                       THE THOMAS KINKADE COMPANY
17

18       Based on the foregoing stipulation of the parties, and good cause appearing,

19   it is hereby ordered that:

20       1.    The clerk shall file the First Amended Complaint; and

21       2.    TKC's previously-filed motions to dismiss and to strike shall be

22   deemed to be directed toward the First Amended Complaint and shall be heard on

23   December 7, 2007.

24       IT IS SO ORDERED.

25   Dated: October ___, 2007

26                                    _____
                                          SUSAN ILLSTON
27                                    UNITED STATES DISTRICT JUDGE

28
     STIPULATION AND [PROPOSED] ORDER *RE*:                    CASE NO. C 07-4721 SI
     1ST AMENDED COMPLAINT AND DECEMBER 7 HEARING

                                    - 3 -

**EXHIBIT "1" TO  STIPULATION**

CHARLES L. COLEMAN, III (CA. Bar No. 65496)
ANDREW T. CAULFIELD (CA. Bar No. 238300)
HOLLAND & KNIGHT LLP
50 California Street, 28th Floor
San Francisco, California 94111
Telephone: (415) 743-6900
Facsimile: (415) 743-6910
charles.coleman@hklaw.com
andrew.caulfield@hklaw.com

Attorneys for Plaintiff
DAVID KAYNE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION – **E-Filing**

| | |
|---|---|
| DAVID KAYNE, an individual citizen of Georgia,<br><br>                    Plaintiff,<br><br>          vs.<br><br>THE THOMAS KINKADE COMPANY, formerly known as MEDIA ARTS GROUP, INC., a Delaware Corporation,<br><br>                    Defendant. | Case No. C 07-4721 SI<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I.    **THE PARTIES**

1.     Plaintiff DAVID KAYNE ("Mr. Kayne") is an individual. Mr. Kayne is, and at all relevant times has been, a citizen and resident of the State of Georgia.

2.     Plaintiff is informed and believes, and on that basis alleges, that defendant The Thomas Kinkade Company, formerly known as Media Arts Group, Inc. ("TKC") is, and at all relevant times has been, a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 900 Lightpost Way, Morgan Hill, California 95037, within the County of Santa Clara, California.

//

1   **II.     JURISDICTIONAL STATEMENT (LOCAL RULE 3-5)**

2          **A.     Jurisdiction**

3          3.     The Court has original jurisdiction of this matter under 28 U.S.C. §

4   1332 because complete diversity of citizenship exists between plaintiff (Mr. Kayne,

5   a citizen and resident of Georgia) and defendant (TKC, a Delaware corporation with

6   its principal place of business in California).  The matter in controversy is in excess

7   of $75,000 because it involves a "Personal Guaranty" under which defendant TKC is

8   seeking to extract from Mr. Kayne the sum of $1,159,209.25 (plus additional

9   interest at $268.57 per day), consisting of a principal claimed amount of $554,605,

10  plus an additional $476,711.75 in interest, and an additional $127,892.50 in alleged

11  attorneys' fees and costs.  TKC seeks to collect on these claims – all of which are

12  disputed by Mr. Kayne – through the use of an unconscionable and unenforceable

13  "expedited" arbitration procedure described in a corporate "Application for Credit"

14  that accompanied a "Personal Guaranty" signed by Mr. Kayne.

15         **B.     Intradistrict Assignment**

16         4.     This case has been determined to be related to Case No. C 04-00186 SI,

17  which was brought and decided by this Court in the San Francisco Division.

18  Accordingly, assignment to the San Francisco Division is appropriate.

19         **C.     Venue**

20         5.     Venue is proper in this District because: (i) Defendant TKC has its

21  principal place of business in this District; (ii) The unlawful, unfair, fraudulent and

22  unconscionable acts and business practices that are the subject of this complaint

23  were performed by TKC, in whole or in part, within the county of Santa Clara in

24  this District; (iii) This case is related to an earlier case in this District (No. 04-00186

25  SI); and (iv) TKC is likely shortly to seek to enforce, in this District and possibly in

26  this action, a purported "award" resulting from the "expedited" arbitration

27  procedure that is the subject of the Complaint in this action.

28

---

- 2 -

III.     **SUMMARY OF RELIEF REQUESTED**

6.     **The Subject Matter of this Complaint:** In this action, plaintiff David Kayne asks this Court to overturn as unlawful and unconscionable, under established California and Ninth Circuit precedent, an "expedited" arbitration procedure set out in defendant TKC's standard contracts of adhesion, entitled "Application for Credit" and "Personal Guaranty", copies of which are attached as Exhibit "A" to this Complaint.[1] As TKC has applied these agreements, Mr. Kayne (who has substantial objections to TKC's claim against him for over $1.15 million requiring testimony from witnesses) was required to defend against TKC's claim in California but to "waive all right to any hearing requiring witness production" at the arbitral hearing and the arbitrator has been required and directed to issue a "binding and final" ruling based only on "the written documentary evidence supplied by the parties", with no right of discovery beforehand or cross-examination at the "hearing". *See* Exhibit "A".  TKC's express restrictions on the hearing rights of a party signing its standard "Application for Credit" and "Personal Guaranty" are significantly more limiting than the AAA's "expedited" rules otherwise provide for disputes involving *less than $10,000*.[2]  More than one hundred times that amount is at stake here.  For the reasons set out more fully below, Mr. Kayne contends that this "expedited" arbitration procedure in Exhibit "A" is unlawful, unconscionable and unenforceable.

7.     **Statement of Relief Requested:** First, Mr. Kayne seeks a declaration from this Court that: (a) The "expedited" arbitration provision

---

[1]     Exhibit "A" contains both a difficult-to-read signed copy and a more legible unsigned version of the "Application for Credit" and "Personal Guaranty" at issue.

[2]     Specifically, AAA Commercial Arbitration Rule E-6, applicable to the "expedited" procedures that TKC seeks to modify and then impose on Mr. Kayne, states that: "*Where no party's claim exceeds $10,000*, exclusive of interest and arbitration costs, and other cases in which the parties agree, the dispute shall be resolved by the submission of documents, *unless any party requests an oral hearing*, or the arbitrator determines that an oral hearing is necessary." (Italics added.)  The AAA rules are available online at www.adr.org.

First Amended Complaint                                    Case No. C 07-4721 SI

1    embedded in Exhibit "A" is unlawful, unconscionable, unenforceable and void; and

2    (b) TKC's attempt to enforce this "expedited" arbitration provision against Mr.

3    Kayne constitutes an unlawful, unfair or fraudulent business act or practice under

4    the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq.*).

5    Second, Mr. Kayne asks that this Court: (a) Find and declare that any award

6    against Mr. Kayne resulting from the implementation of the "expedited" arbitration

7    procedure in TKC's agreements is void, unenforceable and of no effect; and (b)

8    Preliminarily and permanently enjoin TKC from further seeking to enforce against

9    Mr. Kayne either the arbitration provisions set out in Exhibit "A" or any arbitral

10   "award" resulting from the application of those provisions.

11   **IV.    GENERAL ALLEGATIONS**

12          **A.    TKC's Dealer Agreements with Kayne Art Galleries of Georgia,**

13                 **Inc.  ("KAG")**

14          8.    TKC is, and at all relevant times has been, in the business of

15   reproducing and mass-marketing the works of popular painter Thomas Kinkade

16   through a wide variety of  outlets, including but not limited to dealers licensed by

17   TKC pursuant to "Dealer Agreements" prepared by TKC.

18          9.    Mr. Kayne is the founder, President and (along with his wife, Tracy)

19   principal shareholder of a family-owned art gallery company known as Kayne Art

20   Galleries of Georgia, Inc. ("KAG").  At all relevant times, KAG has been a Georgia

21   corporation with its principal place of business in Buford (near Atlanta), Georgia.

22   Mr. Kayne started KAG in 1998 in order to pursue, through KAG, what he believed

23   to be an exciting opportunity to market Thomas Kinkade art work and

24   reproductions and in the Atlanta area.

25          10.    At all relevant times, TKC has  controlled the distribution and

26   marketing of Thomas Kinkade artwork and TKC-manufactured reproductions

27   through a nationwide network of  dealers.  TKC established various categories of

28

First Amended Complaint                                      Case No. C 07-4721 SI

1   authorized dealers, depending on the volume of artwork and TKC-manufactured

2   reproductions the dealer would commit to purchase from TKC for resale to

3   consumers.

4       11.    TKC encouraged potential dealers, including Mr. Kayne, to become a

5   TKC-authorized dealer at highest dealer level, the "Signature Dealer".  This

6   encouragement came in the form of exclusive territories, exclusive marketing

7   opportunities, incentives such as cash and prizes, and other purported benefits of

8   selling the supposedly-valuable mass produced TKC art products described to Mr.

9   Kayne and other potential "Signature Dealers" who attended TKC's motivational

10  "training" sessions conducted at its headquarters in Santa Clara County, California,

11  at which the opportunity to become a "Signature Dealer" was offered to Mr. Kayne.

12      12.    In its offerings to and dealings with Mr. Kayne and other prospective

13  and actual dealers, TKC touted its adherence to the "Christian values" of its

14  namesake (Thomas Kinkade) and encouraged Mr. Kayne and others to feel that

15  they would be dealing with TKC in an atmosphere of mutual trust and respect.

16  TKC often referred to dealers as its "partners".  Mr. Kayne was induced by TKC's

17  representations about its trustworthiness to let down his guard and trust TKC in

18  his dealings with it, including not scrutinizing documents or agreements put before

19  him by TKC to the extent he otherwise would have.

20      13.    As a result of these representations, Mr. Kayne was induced to sign,

21  and did sign on behalf of KAG, a series of  standard form "Dealer Agreements"

22  prepared by TKC (then operating as "Media Arts Group, Inc.") for each of a number

23  of galleries opened by KAG in the Atlanta area.  A representative example of one of

24  TKC's "Dealer Agreements" with KAG is attached as Exhibit "B" to this Complaint.

25  These Dealer Agreements provided, *inter alia,* that KAG must purchase at least

26  $100,000 of art inventory per dealer location from TKC in the first year of the

27  agreements and achieve at least $200,000 in retail sales per dealer location in the

28

First Amended Complaint                                    Case No. C 07-4721 SI

1    first year; both of these requirements were subject to adjustment in later years

2    "according to a formula applied to every Signature Gallery." Exhibit "B",

3    paragraphs 5.a. and 5.b.

4        14.    These Dealer Agreements between TKC and KAG were entered into in

5    1999-2000. The Dealer Agreements form part of the background giving rise to

6    TKC's presentation to Mr. Kayne, in or about October, 2001, of TKC's standard form

7    of "Application for Credit" and "Personal Guaranty". The "expedited arbitration"

8    provision that TKC now seeks to apply against Mr. Kayne, and which is the subject

9    of this Complaint, is embedded in the corporate "Application for Credit" form

10   submitted by KAG, copies of which are attached as Exhibit "A" to this Complaint.

11       **B.    TKC's Failure To Provide Disclosures Required by Applicable**

12            **California and Federal Franchise Laws and Regulations**

13            **Contributed to the Procedural Unconscionability of the**

14            **"Expedited" Arbitration Clause TKC Now Seeks To Enforce.**

15       15.    As a California-based business with "Signature Dealers" both inside

16   and outside California, TKC is, and at all relevant times has been, subject to the

17   registration and disclosure requirements of the California Franchise Investment

18   Law set out in sections 31000, *et seq.* of the California Corporations Code ("CFIL").

19   TKC's Dealer Agreements met the definition of a "franchise" under § 31005(a) of

20   CFIL in that:

21            a.    The Dealer Agreements were written agreements that granted

22            a "right to engage in the business of offering, selling or distributing

23            goods or services under a marketing plan or system prescribed in

24            substantial part by a franchisor". [CFIL § 31005(a)(1)];

25            b.    "The operation of the franchisee's business pursuant to such

26            plan or system is substantially associated with the franchisor's

27            trademark, service mark, trade name, logotype, advertising or other

28

- 6 -

1          commercial symbol designating the franchisor or its affiliate"

2          [CFIL § 31005(a)(2)]; and

3                    c.       "The franchisee is required to pay, directly or indirectly, a

4          franchise fee".

5          16.     Pursuant to CFIL, TKC was required to, but did not, make detailed

6    disclosures to KAG and/or to Mr. Kayne on a wide variety of subjects specified in

7    the Uniform Franchise Offering Circular ("UFOC") prescribed by the California

8    Commissioner of Corporations pursuant to the CFIL.  The  UFOC calls for detailed

9    disclosures of numerous financial details of the Dealer Agreement arrangement as

10   well as the later corporate "Application for Credit" and "Personal Guaranty" that

11   Mr. Kayne was later induced to sign by TKC.  Of particular relevance here, "item

12   17" of the UFOC required detailed and prominent disclosures by TKC of the dispute

13   resolution and forum provisions of any agreements it entered into with franchisees

14   and their principals.

15         17.     TKC did not provide to KAG or to Mr. Kayne or (on information and

16   belief) any other actual or prospective TKC "Dealer" or signer of its standard form

17   "Application for Credit" and "Personal Guaranty" the disclosures required under the

18   California Franchise Investment Law.

19         18.     Had TKC provided the disclosures it was required to provide under

20   CFIL to KAG and/or Mr. Kayne, Mr. Kayne would not have signed the "Application

21   for Credit" and "Personal Guaranty" in connection with which TKC now seeks to

22   pursue "expedited" arbitration as TKC has narrowly defined that term in its form

23   agreements.

24         19.     As a franchisor that had franchisees in California, TKC was also

25   obliged under CFIL §§ 31000, *et seq.* to register its franchise arrangements and to

26   prepare and provide to all prospective franchisees and their principals a detailed

27

28

---

First Amended Complaint                                    Case No. C 07-4721 SI

1  registration statement for its offers of Dealer Agreements and any related

2  "Application for "Credit" and "Personal Guaranty".

3      20.    On information and belief, TKC has neither registered its franchise

4  offering nor established, as required, its right to an exemption from the registration

5  requirements.

6      21.    In any event, TKC has never provided to KAG or to Mr. Kayne (or, on

7  information and belief, any other prospective or actual TKC dealer) a copy of the

8  offering circular required under CFIL § 31114.

9      22.    Had TKC provided to KAG or to Mr. Kayne the required offering

10  circular and other information required of registered franchisors, Mr. Kayne would

11  not have signed the "Application for Credit" and "Personal Guaranty" presented to

12  KAG and to Mr. Kayne during the course of the (now terminated) franchise

13  relationship between TKC and KAG.

14      23.    TKC's nationwide art dealer franchising scheme (including its dealings

15  with KAG) involved interstate commerce.

16      24.    TKC's offerings and attempted enforcement of "Dealer Agreements"

17  and any related "Application for Credit" and "Personal Guaranty" are subject to

18  federal franchising regulations (16 C.F.R. Part 436 – "Disclosure Requirements and

19  Prohibitions Concerning Franchise") promulgated by the Federal Trade Commission

20  ("FTC") pursuant to the Federal Trade Commission Act (15 U.S.C. §§ 41-58).

21      25.    TKC's offerings and other activities as described above met the FTC

22  definition of a franchise arrangement as set out in 16 C.F.R. § 436.1(h), in that:

23      a.    The franchisee obtained "the right to operate a business that is

24      identified or associated with the franchisor's trademark, or to offer, sell, or

25      distribute goods, services or commodities that are identified or associated

26      with the franchisor's trademark".  [16 C.F.R. § 436.1(h)(1)];

27  //

28

First Amended Complaint                              Case No. C 07-4721 SI

b.    The franchisor "will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation" [16 C.F.R. § 436.1(h)(2)]; and

c.    "As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate." [16 C.F.R. § 436.1(h)(3).]

26.    FTC franchise regulations require (at 16 C.F.R. § 436.3) disclosures to prospective franchisees and their principals very similar to those required by the Uniform Franchise Offering Circular prescribed under California law.

27.    Pursuant to 16 C.F.R. Part 536, TKC was required to, but did not, make detailed disclosures to KAG and/or to Mr. Kayne on a wide variety of subjects specified in the 16 C.F.R. Part 536.  These FTC regulations call for detailed disclosures of numerous financial details of the Dealer Agreement arrangement as well as the later corporate "Application for Credit" and "Personal Guaranty" that Mr. Kayne was induced to sign by TKC.

28.    TKC did not provide to KAG or to Mr. Kayne or (on information and belief) any other actual or prospective TKC "Dealer" or signer of its standard form "Application for Credit" and "Personal Guaranty" the disclosures required under the FTC regulations set out in 16 C.F.R. Part 536.

29.    Had TKC provided the disclosures it was required to provide under 16 C.F.R. Part 536 to KAG or Mr. Kayne, Mr. Kayne would not have signed the "Application for Credit" and "Personal Guaranty" in connection with which TKC now seeks to pursue "expedited" arbitration as TKC has defined that term in its form agreements.

//

//

1

       **C.**       **The "Application for Credit" and "Personal Guaranty"**

2

       30.     The "Application for Credit" and "Personal Guaranty" (Exhibit "A")

3 were contracts of adhesion prepared by TKC as form agreements and presented by

4 to KAG and to Mr. Kayne as "take it or leave it" application forms and in an

5 atmosphere when TKC (as an existing creditor of KAG, which had signed Dealer

6 Agreements obliging it to continue purchasing hundreds of thousands of dollars of

7 TKC's mass-produced reproductions as inventory) was in a vastly superior

8 bargaining position to that of KAG and David Kayne.

9

       31.     At the time he signed the "Application for Credit" on behalf of KAG in

10 October of 2001 and the Personal Guaranty, it was not within Mr. Kayne's

11 reasonable expectations that, five or six  years later, TKC would now assert that it

12 is entitled to conduct a "no witnesses", "no discovery" mini-hearing in California

13 that could result in Mr. Kayne facing an award against him personally for more

14 than $1.15 million.

15

       32.     Mr. Kayne has objected to the "expedited" arbitration procedure but

16 TKC has pursued the procedure despite Mr. Kayne's objections.

17

       **D.**       **TKC's First Attempt To Rely on an Arbitral Award Based**

18

               **on the "Personal Guaranty" Was Rejected by this Court and**

19

               **the Ninth Circuit Court of Appeals.**

20

       33.     After KAG and Mr. Kayne executed the "Application for Credit" and

21 "Personal Guaranty", the relationship between TKC and KAG (as well as Mr.

22 Kayne) deteriorated dramatically.  The relationship deteriorated because the high-

23 volume art business that  TKC required and encouraged its Signature Dealers

24 (including KAG) to develop proved to be increasingly unprofitable and KAG (as well

25 as other Signature Dealers) became increasingly disillusioned with the business

26 model that had been sold to them by TKC without adequate disclosures. KAG also

27 perceived that TKC was exacerbating the situation by flooding the market through

28

First Amended Complaint                     Case No. C 07-4721 SI

1    excessive sales of mass-produced TKC reproductions to various discounters. KAG

2    found it increasingly difficult to sell its mounting inventories of TKC products for a

3    profit.  At the same time, TKC refused requests to take back its increasingly-

4    worthless output of art reproductions from KAG and other dealers and continued to

5    enforce the purchase and sale quotas set in TKC's "Signature Dealer Agreements".

6    The result, predictably, was that KAG became unable to pay, and did not pay, TKC

7    for the TKC art reproductions that had piled up in KAG's inventory.

8       34.     KAG's inability to pay for large shipments of TKC mass-produced art

9    products resulted in TKC's termination of KAG's Dealer Agreements and  a series of

10   arbitral and legal disputes surrounding TKC's effort to extract payment for its ,

11   described more fully below, that form the background for TKC's most recent attack

12   on Mr. Kayne by way of the  unusual "expedited" arbitration procedure that is the

13   subject of this action for  declaratory and injunctive relief.

14      35.     On or about December 10, 2002, TKC filed a Demand for  Arbitration

15   with the American Arbitration Association ("AAA") against KAG under the Dealer

16   Agreements between KAG and TKC seeking to collect more than $600,000 for its

17   mass-produced "artwork" for which KAG had not paid.  In its Demand, TKC also

18   purported to name David Kayne and his wife, Tracy, as "Respondents" personally

19   responsible to pay the claimed amounts to TKC, even though they were not parties

20   to the Dealer Agreements.  David and Tracy Kayne responded by denying

21   individual liability for the debts incurred by KAG under the Dealer Agreements,

22   and then David Kayne appeared to testify as a witness on behalf of KAG regarding

23   its defenses and counterclaims.

24      36.     After extensive AAA arbitration between TKC and KAG, a divided

25   AAA panel issued a final award on August 27, 2004.  The majority's award accepted

26   all of TKC's claims against KAG and rejected all of KAG's counterclaims against

27   TKC.  The award also purported to make David Kayne personally and jointly liable

28

- 11 -

1    for the award against KAG, solely on the basis that "David Kayne signed a personal

2    guarantee on October 2, 2001 in applying for a greater amount of credit . . ., verified

3    his signature on cross examination and admitted that he 'now'[3] understands this

4    obligation."

5        37.    Thereafter, TKC sought to confirm the award in its entirety, and Mr.

6    Kayne and KAG sought to vacate that portion of the AAA award that was entered

7    against David Kayne personally, on the ground that he was not personally a party

8    to the Dealer Agreement and did not participate in his personal capacity in the AAA

9    arbitration. Those proceedings were styled *The Thomas Kinkade Company v. David*

10   *Kayne, Tracy Kayne and Kayne Art Galleries of Georgia, Inc.* (N.D. Cal. CV-04-

11   MISC (SI)).  While challenging the award against Mr. Kayne personally, KAG and

12   Mr. Kayne did not challenge the arbitral award against KAG, in the amount of

13   $631,634.86.

14       38.    In a seven-page memorandum opinion and order issued on January 10,

15   2005, Judge Illston vacated the award against David Kayne personally, on the

16   ground that he was not a party to the Dealer Agreements and had not participated

17   in his personal capacity in the AAA arbitration against KAG.

18       39.    TKC appealed of Judge Illston's decision to the U.S. Court of Appeals

19   for the Ninth Circuit.  In an order issued May 24, 2007, a panel of the Ninth Circuit

20   unanimously affirmed Judge Illston's order vacating the AAA award against Mr.

21   Kayne,[4] which had been based solely on Mr. Kayne's execution of the Personal

22   Guaranty.  This decision is now final.

---

23   [3]    This statement is set out in the  AAA "Reasons for Award" dated July 7,

24   2004 at ¶ 6.  The AAA panel's reference to Mr. Kayne's "now" understanding the
     personal guarantee refers to Mr. Kayne's testimony at the arbitration indicating

25   that he did not really review the "Personal Guaranty" form at the time he signed it
     or understand its import.

26   [4]    *The Thomas Kinkade Company v. David Kayne*, 9th Cir. No. 05-15245, Slip
     Copy, 2007 WL 154430 (9th Cir., May 24, 2007).  The court's decision is

27   unpublished.  However, plaintiff references it in this complaint because: (1) Under
     Ninth Circuit Rule 36-3 (b), it was issued after January 1, 2007 and is citable

28   pursuant to Federal Rule of Appellate Procedure 32.1; (2) In any event, this decision

First Amended Complaint                                      Case No. C 07-4721 SI

1          **E.    Other Litigation Background (*TKC v. Kayne II and III*)**

2          40.    ***TKC v. Kayne II*:** Unfortunately, TKC's efforts to pursue KAG and Mr.

3   Kayne did not end with Judge Illston's (now final and affirmed) judgment affirming

4   an arbitral award against KAG and setting it aside against David Kayne. Although

5   it had been terminated by TKC as a "Signature Dealer", KAG still had a significant

6   inventory of TKC art reproductions on its hands that it needed to liquidate and had

7   a right to sell. KAG sought to enhance its sales by using a standard sales technique

8   known as "highlighting" in which a TKC-authorized "artist" would dab bits of "real

9   paint" on a TKC art reproduction to "highlight" it. For this purpose, KAG hired the

10  same person (Obie Dozier) who had performed highlighting functions, with TKC's

11  approval, while KAG was still a Signature Dealer. TKC's response was to file

12  another action in this Court, styled *The Thomas Kinkade Company, formerly known*

13  *as Media Arts Group, Inc. v. David Kayne, Tracey (sic) Kayne, Kayne Art Galleries of*

14  *Georgia, Inc., and Obie Dozier*, N.D. Cal. Case No. C-04-00571 CW (EDL) ("*TKC v.*

15  *Kayne II*"). KAG ceased its efforts to sell through high-end "highlighting" events

16  and *Kayne II* was settled in or around March of 2005.

17         41.    ***TKC v. Kayne III*:** Meanwhile, in December of 2004, TKC filed a

18  different action against KAG and David Kayne personally, this time in the Central

19  District of California (closer to TKC's regular counsel), styled *The Thomas Kinkade*

20  *Company v. David Kayne and Kayne Art Galleries of Georgia, Inc.*, C.D. Cal. No. C-

21  04-1396 (GLT)(MLGx) ("*Kayne III*").[5]  In *Kayne III,* TKC asserted numerous causes

22  of action against KAG and Mr. Kayne arising out of KAG's efforts to unload its

23  inventory of TKC artwork through "low-end" sales techniques such as billboard

24  trucks and internet discount sites that TKC claimed were infringements of its

25  _____

26  is potentially relevant "under the doctrine of law of the case" on certain issues in
    this proceeding and also is cited herein for purposes of factual background.

27  [5]      The case was later re-assigned to Judge Pregerson and thereafter designated
    as C.D. Cal. Case No. C-04-10534 DDP (PJWx).

28

First Amended Complaint                                      Case No. C 07-4721 SI

1  trademarks and domain names.  Mr. Kayne and KAG asserted counterclaims for

2  misrepresentation and fraud.  Ultimately, Mr. Kayne agreed to give up the

3  marketing techniques of which TKC complained and *Kayne III* was settled and the

4  parties' claims dismissed by stipulation approved by Judge Pregerson on June 13,

5  2006.

6  **F.    TKC's Second (Current) Attempt To Take Advantage of**

7  **the "Personal Guaranty" Signed by Mr. Kayne in 2001 ("*TKC v.***

8  ***Kayne IV*")**

9       42.    On July 10, 2006 – less than a month after the dismissal of *Kayne III*

10 but nearly five years after Mr. Kayne signed the "Personal Guaranty"– TKC filed a

11 demand for arbitration with the American Arbitration Association, invoking the

12 "expedited" arbitration procedures set out in Exhibit "A" and demanding $554,605

13 from Mr. Kayne personally under the "Personal Guaranty" based on the alleged

14 debts of KAG to TKC.  As a result, Mr. Kayne finds himself involved now in yet

15 another AAA proceeding in which he is neither a proper,[6] nor a willing,[7] party.

16      43.    In response, Mr. Kayne filed an action in the U.S. District Court for

17 the Northern District of Georgia seeking a determination that: (1) The arbitration

18 provision set out in the "Application for Credit" submitted by KAG to TKC did not

19 apply to the separate "Personal Guaranty" signed by Mr. Kayne (Count I); (2) There

20 was in fact no agreement to arbitrate due to TKC's failure to accept the "Application

---

[6]    As noted above, the question of whether Mr. Kayne is in fact a party to an agreement to arbitrate was presented to the district court in Georgia and is presently before the Eleventh Circuit.  Mr. Kayne does not seek to re-argue that question here.

[7]    Mr. Kayne separately contends that, if an agreement to arbitrate is deemed to exist between him and TKC under the "Personal Guaranty", then this agreement to arbitrate is clearly unconscionable under the standards recently articulated by the Ninth Circuit's *en banc* decision in *Nagrampa v. Mailcoups, Inc.*, 469 F.3d 1257 (9th Cir, December 4, 2006), *after* Mr. Kayne had presented his case to Judge Pannell in Georgia.  Because TKC is based in this District and is now proceeding with an "expedited" arbitration set to occur in this District, it is appropriate for Mr. Kayne to present his claims – which are based in substantial part on the recent *Nagrampa* decision  – to this Court.

---

First Amended Complaint                                    Case No. C 07-4721 SI

1   for Credit" (Count II); (3) There was no agreement to arbitrate due to lack of

2   consideration (Count III); and (4) There was no effective "Personal Guaranty"

3   agreement by reason of the statute of frauds (Count IV). This action was styled

4   *David Kayne v. The Thomas Kinkade Company* (N.D. Ga. No. 1:06-CV-2168-CAP).

5          44.    After a series of motions conducted in the fall of 2006, Judge Pannell of

6   the Northern District of Georgia issued an Order on March 29, 2007, rejecting

7   David Kayne's arguments and granting TKC's motion to compel arbitration. That

8   Order was the subject of a pending appeal by David Kayne before the U.S. Court of

9   Appeals for the Eleventh Circuit as its Case No. 07-11984-H. On October 3, 2007,

10  in an unpublished decision, the Eleventh Circuit affirmed Judge Pannell's order.

11         45.    It is not the aim of this Complaint to seek to re-litigate any issue that

12  was presented to Judge Panel and on which he ruled in his March 29 Order as now

13  affirmed by the Eleventh Circuit Court of Appeals.

14         46.    The Georgia district court and Eleventh Circuit proceedings involved

15  the question whether there was or was not an agreement to arbitrate between TKC

16  and David Kayne. The issues Mr. Kayne is presenting to this Court are different,

17  and did not properly arise until it was first determined that there was, in fact, an

18  agreement between TKC and Mr. Kayne to arbitrate. The issue now presented to

19  this Court is whether, assuming there was an agreement to arbitrate under the

20  provisions of Exhibit "A", such an agreement is unconscionable and therefore

21  unenforceable under standards first clearly articulated by the Ninth Circuit's *en*

22  *banc* decision in *Nagrampa v. Mailcoups, Inc.* 469 F.3d 1257 (9th Cir. 2006)

23  ("*Nagrampa*").

24         47.    The Ninth Circuit  issued its decision in  *Nagrampa* on December 4,

25  2006. This was well <u>after</u> Mr. Kayne's Georgia attorneys had submitted his case to

26  the district court in Georgia.

27

28

First Amended Complaint                                    Case No. C 07-4721 SI

1      48.     In *Nagrampa*, the majority opinion *withdrew* the prior opinion of a

2   three-judge panel that "held that unconscionability of an arbitration provision

3   contained in the franchise agreement is a question for the arbitrator to decide" and

4   instead determined that this is an issue for the court to decide.  The Ninth Circuit

5   in *Nagrampa* went on to rule that an arbitration provision far less draconian than

6   the "expedited" procedure sought to be enforced by TKC is procedurally and

7   substantively unconscionable, and therefore unenforceable, as a matter of law.  This

8   is precisely the relief that Mr. Kayne seeks from this Court.

9      49.     TKC (after sitting on the "Personal Guaranty" for several years) has

10   now elected to pursue, with an air of sudden urgency, the "expedited" arbitration

11   procedure described in Exhibit "A".  In doing so, TKC has consistently maintained

12   that the procedure set out in Exhibit "A" must be followed, so that no discovery,

13   witnesses or cross-examination are to be conducted at the "hearing".

14      50.     Pursuant to TKC's Notice of Arbitration, an arbitrator was appointed

15   and he set the hearing to occur on October 16, at a place to be determined within

16   the County of Santa Clara, within this District.

17      51.     Counsel for Mr. Kayne have appeared specially by telephone before the

18   Arbitrator and have repeatedly asserted (and the Arbitrator and TKC have

19   repeatedly acknowledged) that Mr. Kayne has not agreed to anything connected to

20   the arbitration and specifically has not waived his objections to the arbitration, all

21   of which have been expressly preserved.   Accordingly, Mr. Kayne did not attend the

22   hearings and instead maintained that the hearing provisions and procedures were

23   and are unconscionable under *Nagrampa*.

24      52.     Mr. Kayne has substantial defenses to the claims that TKC seeks to

25   advance against him require the ability to conduct discovery and call and cross-

26   examine witnesses.  These defenses include but are not limited to those based on

27   the failure of TKC and its agents to disclose material information to Mr. Kayne

28

- 16 -

First Amended Complaint                              Case No. C 07-4721 SI

1    regarding Exhibit "A" and the underlying Dealer Agreements before Mr. Kayne

2    signed Exhibit "A", as well as material misrepresentations made to Mr. Kayne in

3    connection with Exhibit "A" and the underlying Dealer Agreements by TKC and its

4    agents that amount to fraud in the inducement in signing Exhibit "A".

5         53.    If TKC is permitted to enforce its "expedited" arbitration procedure or

6    any award resulting from it, Mr. Kayne will be subjected to an unconscionable

7    denial of basic fairness and due process.  Specifically, Mr. Kayne will have been

8    deprived of his right to assert and present effectively his substantial defenses to the

9    claims of TKC against him for over $1.15 million. Mr. Kayne was legitimately

10   concerned that if he proceeded in any manner before the AAA arbitrator, TKC

11   would argue that he thereby waived his objections to the arbitration.  Accordingly,

12   Mr. Kayne responded to the "expedited" arbitration demand by bringing this action

13   seeking to have the "expedited" arbitration agreement invalidated by this Court

14   pursuant to the standards set out in *Nagrampa*.

15   **V.     CAUSES OF ACTION**

16                  **First Cause of Action – Declaratory Relief**

17        54.    Plaintiff David Kayne incorporates and realleges the allegations of

18   paragraphs 1-53 above as if fully stated herein.

19        55.    The documents attached as Exhibit "A" are contracts of adhesion

20   drafted by TKC and imposed by TKC on KAG and Mr. Kayne, who had significantly

21   less bargaining power.

22        56.    Mr. Kayne's signature on the documents attached as Exhibit "A", and

23   specifically his agreement to the "expedited" arbitration provisions set out in

24   Exhibit "A", were procured by TKC in a manner that was procedurally

25   unconscionable at the time the documents were signed.

26

27

28

---

First Amended Complaint                                    Case No. C 07-4721 SI

1    57.    The "expedited" arbitration provisions set out in Exhibit "A" are

2  substantively unconscionable and were unconscionable at the time Exhibit "A" was

3  signed.

4    58.    The standards for determining unconscionability articulated in

5  *Nagrampa* are applicable to TKC's "expedited" arbitration agreement within

6  Exhibit "A".   TKC's "expedited" arbitration agreement is unconscionable, unlawful

7  and unenforceable under the standards set out in *Nagrampa*.

8    59.    A controversy presently exists between Mr. Kayne and TKC with

9  respect to TKC's ongoing and active effort to enforce and apply the unconscionable

10  "expedited" arbitration provisions of Exhibit A through an arbitration proceeding

11  presently scheduled to occur in Santa Clara County, in this District, on October 16,

12  2007.

13    60.    David Kayne is entitled to a declaration from this Court that the

14  "expedited" arbitration provisions of Exhibit A are unlawful, unconscionable,

15  unenforceable and void as a matter of law, so that if TKC wishes to pursue its

16  claims against Mr. Kayne under the "Personal Guaranty", it must do so in a court of

17  law, in which Mr. Kayne will be afforded a full, fair and complete hearing and due

18  process.

19    61.    In the event that an award or other form of relief is given to TKC by

20  the AAA arbitrator appointed pursuant to Exhibit "A", David Kayne is entitled to a

21  declaration from this Court that any such award is unenforceable and void.

22    **Second Cause of Action – Injunctive Relief**

23    62.    Plaintiff David Kayne incorporates and realleges the allegations of

24  paragraphs 1-61 above as if fully stated herein.

25    63.    Mr. Kayne will be significantly and unfairly damaged if the "expedited"

26  arbitration procedure in TKC's agreements results in an award that is enforced

27  against Mr. Kayne.

28

- 18 -

First Amended Complaint                                    Case No. C 07-4721 SI

64.    Because the "expedited" arbitration provisions of Exhibit "A" are unlawful and unconscionable on their face where a disputed claim for over $1.15 million is concerned, TKC should be preliminarily and permanently enjoined from seeking to enforce any arbitral "award" resulting from the arbitration procedures set out in Exhibit "A".

### Third Cause of Action – Declaratory Relief
### (Cal. Bus. & Prof. Code Sections 17200, *et seq.*)

65.    Plaintiff David Kayne incorporates and realleges the allegations of paragraphs 1-64 above as if fully stated herein.

66.    TKC's attempt to enforce the "expedited" arbitration provisions in Exhibit "A", which Mr. Kayne was induced to sign without having been provided the disclosures required under the California Franchise Investment Law and the Federal Trade Commission's franchise regulations, constitutes an "unlawful, unfair or fraudulent business act or practice" within the meaning of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200) and is prohibited by California law.

67.    A controversy presently exists between Mr. Kayne and TKC with respect to the lawfulness of TKC's ongoing and active effort to continue its ongoing violation of the California Unfair Competition law by seeking to enforce and apply the "expedited" arbitration provisions of Exhibit A (and any resulting "award") against Mr. Kayne.

68.    David Kayne is entitled to a declaration from this Court that TKC's attempt to enforce the "expedited" arbitration provisions of Exhibit A, or any award issued as a result thereof, is an "unlawful, unfair or fraudulent business act or practice" within the meaning of the California Unfair Competition Law.

//

//

- 19 -

First Amended Complaint                                    Case No. C 07-4721 SI

**Fourth Cause of Action – Injunctive Relief**

**(Cal. Bus. & Prof. Code Sections 17200, *et seq.*)**

69    Plaintiff David Kayne incorporates and realleges the allegations of paragraphs 1-68 above as if fully stated herein.

70.    Mr. Kayne will be significantly and unfairly damaged if the "expedited" arbitration being pursued by TKC through the AAA in contravention of the California Unfair Competition Law is allowed to proceed to an award that is enforced against Mr. Kayne.

71.    Because the "expedited" arbitration provisions of Exhibit "A" are unlawful and violate the California Unfair Competition Law as applied to Mr. Kayne, TKC should be preliminarily and permanently enjoined from seeking to enforce any arbitral "award" resulting from the arbitration procedures set out in Exhibit "A".

WHEREFORE, Plaintiff David Kayne respectfully prays for relief from this Court as follows:

1.    On his first cause of action, a declaration by this Court that the arbitration provisions in Exhibit "A" are unlawful, unconscionable, unenforceable and void as a matter of law and that any award obtained by TKC as a result of any such arbitration is void and unenforceable.

2.    On his second cause of action, a preliminary and permanent injunction preventing TKC from enforcing or seeking to enforce any arbitral award against Mr. Kayne that TKC might obtain in connection with Exhibit "A".

3.    On his third cause of action, a declaration that TKC's attempt to enforce the "expedited" arbitration provisions of Exhibit "A", or any award issued as a result thereof, is an "unlawful, unfair or fraudulent business act or practice" within the meaning of the California Unfair Competition Law.

First Amended Complaint                                      Case No. C 07-4721 SI

1        4.     On his fourth cause of action, a preliminary and permanent injunction

2    preventing TKC from enforcing or seeking to enforce any arbitral award against Mr.

3    Kayne that TKC might obtain in connection with Exhibit "A".

4        5.     On all causes of action, his costs of suit and such other and further

5    relief as may now or hereafter be appropriate.

6    Dated:  October 26, 2007          HOLLAND & KNIGHT LLP

7

8

9                                 CHARLES L. COLEMAN, III

10                                Attorneys for Plaintiff

11                                DAVID KAYNE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

First Amended Complaint                                  Case No. C 07-4721 SI

# EXHIBIT "A" TO

# FIRST AMENDED COMPLAINT

9.2004  10:56A    ROO  ON & HOOD INC.                    NO.584   P.2/3

05:41      RETAIL DEV. TEAM + MEDIA ARTS GROUP                    NO.15U   P0U
'1:35 FROM:CO IAYNE GALLERIES   7782489948    TO:18716571559      P.002/003
11:19      RETAIL DEV. TEAM + 7782409940                          NO.819   082

## MEDIA ARTS GROUP, INC.
Lladocel Publishing, Inc.
540 Lapoure Way  Morgan Hill, CA 95037 · (800)263-3730 · Fax (408)201-5843

### APPLICATION FOR CREDIT

(Apply for the extension of credit by your firm. The following information is submitted as a basis for your consideration of our application. Please answer all questions below as there are listed, write the word 'none'.)

Kayne Art Galleries of GA, Inc.

6400 Peachtree Industrial, Suite G       STATE GA       ZIP 30071

Norcross                      CONTACT

770-248-9920                  770-248-9940

6400 Peachtree Industrial, Suite G       STATE GA       ZIP 30071

Norcross        CONTACT          FAX

☐ Corporation  ☐ Partnership  ☐ Proprietorship  ☐ LLC  ☐ S-CORP  ☐ LLP.
No. of Social Security No.  58-2410885           Years in Business

| COMPANY DIRECTORS / OFFICERS / PRINCIPAL | | |
|---|---|---|
| David Kayne | TITLE: | President |
| | PHONE: | |
| | TITLE: | |
| | PHONE: | |
| | TITLE: | |
| | PHONE: | |

**BANKING DETAILS**

First Union                     ACCOUNT # 480 184-9613

CITY / STATE / ZIP: Columbus  GA

CONTACT Mike Silvani              PHONE 706-326-8404

**TRADE REFERENCES**

Gallery Marketing               CONTACT:

CITY / STATE / ZIP:

800-323-8140    FAX    ACCOUNT #

Ancal                           CONTACT:

CITY / STATE / ZIP:

925-680-0930    FAX    ACCOUNT #

Ceaco                           CONTACT:

CITY / STATE / ZIP:

617-976-8080    FAX    ACCOUNT #

ABOVE INFORMATION IS FOR THE PURPOSES OF OBTAINING CREDIT AND IS WARRANTED TO BE TRUE. WE HEREBY AUTHORIZE THE FIRM TO WHOM THIS APPLICATION IS MADE TO INVESTIGATE THE REFERENCES LISTED PERTAINING TO MY/OUR CREDIT AND FINANCIAL RESPONSIBILITY.

INITIALS                              (PLEASE PROVIDE PERSONAL GUARANTEE )

MEDIA ARTS EXHIBIT NO. 76

MA 0119133

0023

AUG. 9.2004  10:57AM  ROB  ON & HOOD INC.                    NO.584   P.3/3

O:43/44       05:41    KEIHII DEV. TEMT / KEIHII INUS INUS
T-02-2001 11:55 PRONTCO KRYME GALLERIES   7782489948          P.003/003
8/1/ /15      11:19    RETAIL DEV. TEAM + 7782489948          NO.610  .003

TO:18316571359

**TERMS ARE NET 60 DAYS UPON CREDIT APPROVAL**

DATE: 10/2/01

PLICANT'S NAME:

PLICANT'S SIGNATURE: X  Dan  ___   TITLE:

**FOR PROPRIETORS, PARTNERS, & CORPORATIONS IN THE U.S.**

PLICANT'S SIGNATURE:                                DATE:

**PERSONAL GUARANTY**

GUARANTOR'S
NAME:

GUARANTOR'S
SIGNATURE: X  Dan  ___

HOME ADDRESS:                        CITY / STATE / ZIP:

DATE: 10/2/01                        TAX ID OR S.S. NO.

GUARANTOR'S
NAME:

GUARANTOR'S
SIGNATURE:

HOME ADDRESS:                        CITY / STATE / ZIP:

DATE:                                TAX ID OR S.S. NO.

DISTRICT SALES MANAGER'S SIGNATURE

ACCOUNTS RECEIVABLE
ACCOUNT SET UP BY:                   DATE:

MA 0119126

0024

## The Thomas Kinkade Company

900 Lightpost Way   Morgan Hill, CA  95037  *  1(800)366-3733 * Fax (408)201-5043

### APPLICATION FOR CREDIT

We hereby apply for the extension of credit by your firm.  The following information is submitted as a basis for your consideration of our application.
(Please answer all questions:  when no figures are inserted, write the word 'none'.)

DEALER NAME:

BILL TO ADDRESS:

| CITY: | STATE: | ZIP: |
|---|---|---|
| PHONE: | CONTACT: | FAX: | EMAIL: |

SHIPPING ADDRESS:

| CITY: | STATE: | ZIP: |
|---|---|---|
| PHONE: | CONTACT: | FAX: | EMAIL: |

Company is a : _____ Corporation _____ Partnership _____ Proprietorship _____ L.L.C.     S-CORPS _____ L.L.P.

Federal I.D. No. or Social Security No. _____   Duns No. _____   Years in Business _____

Financial Statements Attached ? _____ YES        NO  (If no, they must be provided prior  to approval of credit application.)

### COMPANY DIRECTORS / OFFICERS / PRINCIPAL

NAME 1 : _____   TITLE: _____

HOME ADDRESS: _____   PHONE: _____

NAME 2 : _____   TITLE: _____

HOME ADDRESS: _____   PHONE: _____

NAME 3 : _____   TITLE: _____

HOME ADDRESS: _____   PHONE: _____

### BANKING DETAILS

BANK NAME: _____   ACCOUNT #: _____

BRANCH ADDRESS: _____   CITY / STATE / ZIP: _____

BANK CONTACT
NAME: _____   PHONE: _____

### TRADE REFERENCES

VENDOR 1 : _____   CONTACT: _____

PYMT ADDRESS: _____   CITY / STATE / ZIP: _____

PHONE: _____   FAX: _____   ACCOUNT #: _____

VENDOR 2 : _____   CONTACT: _____

PYMT ADDRESS: _____   CITY / STATE / ZIP: _____

PHONE: _____   FAX: _____   ACCOUNT #: _____

VENDOR 3 : _____   CONTACT: _____

PYMT ADDRESS: _____   CITY / STATE / ZIP: _____

PHONE: _____   FAX: _____   ACCOUNT #: _____

THE ABOVE INFORMATION IS FOR THE PURPOSES OF OBTAINING CREDIT AND IS WARRANTED TO BE TRUE. I/WE HEREBY AUTHORIZE THE FIRMS TO WHOM THIS APPLICATION IS MADE TO INVESTIGATE THE REFERENCES LISTED PERTAINING TO MY/OUR CREDIT AND FINANCIAL RESPONSIBILITY.

_____   (INITIAL)

**( PLEASE COMPLETE REVERSE SIDE )**

CONDITIONS ( TERMS ARE NET 30 DAYS UPON CREDIT APPROVAL )

TERMS OF SALE, INCLUDING TERMS OF PAYMENT AND CHARGES, FOR EACH PURCHASE ARE AGREED TO BE THOSE SPECIFIED ON THE FACE OF EACH INVOICE. THE CUSTOMER HEREBY AGREES TO PAY ALL COSTS OF COLLECTION OR LEGAL FEES SHOULD SUCH ACTION BE NECESSARY DUE TO NON-PAYMENT. THE ABOVE INFORMATION IS WILLINGLY SUPPLIED AND THE THOMAS KINKADE COMPANY ("CREDITOR") IS AUTHORIZED TO CONTACT THE ABOVE BANK AND TRADE REFERENCES IN ORDER TO ESTABLISH THE CREDITWORTHINESS OF THE ABOVE NAMED COMPANY. IF THE APPLICANT IS NOT A CORPORATION, THE CREDITOR IS AUTHORIZED TO OBTAIN CREDIT REPORTS ON THE PROPRIETORS, PARTNERS OR PRINCIPALS. SHOULD A CREDIT AVAILABILITY BE GRANTED BY THE CREDITOR, ALL DECISIONS WITH RESPECT TO THE EXTENSION OR CONTINUATION SHALL BE IN THE SOLE DISCRETION OF THE CREDITOR. THE CREDITOR MAY TERMINATE ANY CREDIT AVAILABILITY WITHIN ITS SOLE DISCRETION.

DISPUTES: ANY DISPUTE OR CONTROVERSY ARISING FROM THIS AGREEMENT WILL BE RESOLVED BY ARBITRATION BY THE AMERICAN ARBITRATION ASSOCIATION AT SANTA CLARA COUNTY, CALIFORNIA. THE LANGUAGE OF THE ARBITRATION SHALL BE ENGLISH. THE NUMBER OF THE ARBITRATORS SHALL BE ONE. THE PARTIES AGREE THE AMERICAN ARBITRATION ASSOCIATIONS EXPEDITED RULES SHALL APPLY AND THEY WAIVE ALL RIGHT TO ANY HEARING REQUIRING WITNESS PRODUCTION. THE ARBITRATOR SHALL ISSUE AN AWARD BASED UPON THE WRITTEN DOCUMENTARY EVIDENCE SUPPLIED BY THE PARTIES. THE ARBITRATOR'S AWARD SHALL BE BINDING AND FINAL. THE LOSING PARTY SHALL PAY ALL ARBITRATION EXPENSES, INCLUDING ALL ATTORNEY'S FEES.

I HAVE READ AND UNDERSTAND THE ABOVE TERMS AND CONDITIONS, AND HEREBY AGREE TO THEM.

APPLICANT'S SIGNATURE ATTESTS FINANCIAL RESPONSIBILITY, ABILITY AND WILLINGNESS TO PAY CREDITOR'S INVOICES IN ACCORDANCE WITH THE THOMAS KINKADE COMPANY, INC. TERMS. APPLICANT AGREES TO UPDATE THE FINANCIAL INFORMATION CONTAINED WITHIN, AND ATTACHED TO, THIS CREDIT APPLICATION ON AN ANNUAL BASIS AND AGREES TO PAY A LATE CHARGE OF 18% PER ANNUM OF INVOICES NOT PAID WITHIN CREDITOR'S TERMS. APPLICANT AGREES TO ALLOW THE THOMAS KINKADE COMPANY THE RIGHT TO SECURE INVENTORY WITH UCC'S.

APPLICANT'S NAME : _____     DATE : _____

APPLICANT'S SIGNATURE : _____     TITLE : _____

## FOR PROPRIETORS, PARTNERS, S-CORPORATIONS IN THE U.S.

I AUTHORIZE THE SELLER AND THEIR ASSIGNS TO OBTAIN A CONSUMER CREDIT REPORT ON MY CREDIT HISTORY.

APPLICANT'S SIGNATURE : _____     DATE : _____

### PERSONAL GUARANTY

THE UNDERSIGNED, FOR CONSIDERATION DO HEREBY INDIVIDUALLY AND PERSONALLY GUARANTY THE FULL AND PROMPT PAYMENT OF ALL INDEBTEDNESS HERETOFORE OR HEREAFTER INCURRED BY THE ABOVE BUSINESS. THIS GUARANTY SHALL NOT BE AFFECTED BY THE AMOUNT OF CREDIT EXTENDED OR ANY CHANGE IN THE FORM OF SAID INDEBTEDNESS. NOTICE OF THE ACCEPTANCE OF THIS GUARANTY, EXTENSION OF CREDIT, MODIFICATION IN THE TERMS OF PAYMENT, AND ANY RIGHT OR DEMAND TO PROCEED AGAINST THE PRINCIPAL DEBTOR IS HEREBY WAIVED. THIS GUARANTY MAY ONLY BE REVOKED BY WRITTEN CONSENT OF THE CREDITOR. ANY REVOCATION DOES NOT REVOKE THE OBLIGATION OF THE GUARANTORS TO PROVIDE PAYMENT FOR INDEBTEDNESS INCURRED PRIOR TO THE REVOCATION. I AUTHORIZE THE CREDITOR AND THEIR ASSIGNS TO OBTAIN A CONSUMER CREDIT REPORT AND TO CONTACT MY REFERENCES AS NECESSARY. AS GUARANTOR, I AM ALSO BOUND BY THE ABOVE ARBITRATION CLAUSE.

GUARANTOR'S
NAME: _____

GUARANTOR'S
SIGNATURE: _____

HOME ADDRESS: _____     CITY / STATE / ZIP: _____

   DATE: _____     TAX ID OR S.S. NO. _____

GUARANTOR'S
NAME: _____

GUARANTOR'S
SIGNATURE: _____

HOME ADDRESS: _____     CITY / STATE / ZIP: _____

   DATE: _____     TAX ID OR S.S. NO. _____

Office Use Only -
DSM ACCOUNT APPROVAL:
ALL NEW APPLICATIONS ARE SUBJECT TO APPROVAL BY THE DISTRICT SALES MANAGER OF THE TERRITORY.

____   Completed Credit Application
____   Dealer name on Application for Credit must match Dealer
       name on Dealer Agreement.
       Completed Certificate of Resale          DISTRICT SALES MANAGER SIGNATURE

ACCOUNTS RECEIVABLE:
   ACCOUNT SET UP BY : _____     DATE _____

# EXHIBIT "B" TO

# FIRST AMENDED COMPLAINT

# MEDIA ARTS GROUP, INC.
## DEALER AGREEMENT

### THOMAS KINKADE LIMITED EDITION
*DEALER STATUS: SIGNATURE GALLERY DEALER*

The following Media Arts Group, Inc. Dealer Agreement ("AGREEMENT") consists of the Signature Dealer Agreement ("Dealer Agreement"), Exhibit A which addresses Dealer's District ("Exhibit A") and the Standard Terms and Conditions as attached hereto and incorporated herein ("Terms and Conditions"). In the event of a conflict or inconsistency between such documents, the order of precedence shall be as follows: The Dealer Agreement and Exhibit A shall control over the Terms and Conditions; Exhibit A shall control over the Dealer Agreement.

This AGREEMENT, to be effective as of the date below, is entered into between the parties as shown below.

Whereas Media Arts Group, Inc. and its affiliate Lightpost Publishing (collectively "MEDIA ARTS") are in the business of publishing art prints and other products for retail sales through authorized dealers; and

Whereas the undersigned dealer ("DEALER") is, or intends to be, a dealer of art selling only through retail channels; and

Whereas it is the mutual desire of both parties that MEDIA ARTS make products available to DEALER, the parties agree as follows:

1.    Term

This AGREEMENT shall be effective from the date signed below for a period of one (1) year ("Term"). This AGREEMENT shall automatically renew for successive one year Terms thereafter, unless either DEALER or MEDIA ARTS provides the other with written notice at least thirty (30) days prior to the end of the then-current Term otherwise stating that such party wishes to prevent such automatic renewal. Notwithstanding the foregoing sentence or the provision of Section 5 of this DEALER AGREEMENT, absent any material breach of this AGREEMENT (which, after required notice of material breach is given, still remains uncured as provided herein), DEALER shall have the right to renew this AGREEMENT for two (2) renewal Terms (for a total of three Terms) as written on the date hereof (or if subsequently amended by written agreement of the parties, renewal of such amendment). Commencing on Year Four (4), DEALER shall further have the right to renew this AGREEMENT for additional Terms except that such renewals shall be subject to Section 5 of this AGREEMENT.

2.    DEALER Opportunities

(a)  DEALER will be approved to carry all limited edition products, except for any products developed exclusively for MEDIA ARTS company owned galleries or its strategic relationships.

(b)  DEALER will be eligible to receive any "Premier Only" images available from MEDIA ARTS.

(c) DEALER will have the opportunity to participate in a co-op advertising program where DEALER can earn credit to use towards additional product purchases. The current co-op advertising program, subject to change in MEDIA ARTS' sole discretion, is as follows: DEALER earns an advertising allowance of up to five percent (5%) of wholesale purchases from MEDIA ARTS year to date (but not to exceed 50% of total permitted advertising expenditures, such as local advertising and promotions), which is available as credit towards future purchases.

(d) If time and scheduling permits, DEALER will be eligible to host a Thomas Kinkade appearance at their location. Such scheduling is in MEDIA ARTS' sole discretion.

(e) During the term of this AGREEMENT, and subject to approved manner of use, DEALER will be permitted to use the following trademarks: *Thomas Kinkade™, Painter of Light™, Thomas Kinkade Signature Gallery™* and the *Thomas Kinkade Signature Gallery* logo. Should DEALER wish to use any other MEDIA ARTS trademarks, prior written approval by MEDIA ARTS legal department will be required, such approvals being in MEDIA ARTS' sole discretion. Use of trademarks in conjunction with DEALER's gallery name (e.g. Thomas Kinkade at the XYZ Gallery, a Thomas Kinkade Signature Gallery) must be pre-approved in writing.

(f) Signature Dealers, MEDIA ARTS company owned galleries and eligible non-U.S. DEALERS, will have exclusive rights to purchase "Studio Proof" (S/P) and "Gallery Proof" (G/P) inventory from MEDIA ARTS.

(g) DEALER shall be eligible to receive a "DISTRICT," as defined and accepted by MEDIA ARTS, and attached as Exhibit A to this Dealer Agreement. Provided no other Signature DEALER already exists in that DISTRICT, DEALER will be eligible to receive an exclusive right to open Signature locations in that DISTRICT, provided DEALER's business plan and performance qualify DEALER for such exclusivity.

(h) DEALER is approved for extended, net 60 day (from date of invoice), credit terms on all purchases. Should DEALER fail to keep account current in credit status (e.g. if DEALER is on credit hold), MEDIA ARTS reserves the right to cease any and all shipments until the account is returned to current credit status. Subject to DEALERS right to cure default, should the account become more than 90 days past due, MEDIA ARTS reserves the right, to terminate this agreement or move DEALER to a lower strata (i.e. Authorized, Premier or Showcase Premier).

(i) DEALER is guaranteed at least one (1) each of every newly released limited edition image, if ordered within an acceptable time period.

(j) All customer inquiries will be referred to the Premier Dealer, Showcase Premier Dealer and Signature Dealer stores.

(k) DEALER will have access to secondary market information on Thomas Kinkade products.

(l) DEALER will receive 100 free postcards with each studio edition or limited edition release.

(m) DEALER will be eligible for Video training/specialist program with bonus gifts/points for completion.

(n) DEALER, upon DEALER's written request, will receive a personalized photograph of Thomas Kinkade and a Signature Dealer Certificate.

(o) DEALER will have the opportunity to participate in a stock trade-out once a year, which will permit the return of approved inventory under an identified program.

(p) DEALER will receive the quarterly Thomas Kinkade Collector Society mailing announcing upcoming scheduled events.

(q) DEALER will be eligible for the "Dealer of the Month" program.

(r) DEALER, upon DEALER's written request, will receive a Thomas Kinkade Signature Dealer window emblem.

(s) DEALER will have the opportunity to attend special training seminars, including full training at Thomas Kinkade University. DEALER can become "certified" based on completion of particular program or module requirements.

3.     DEALER Obligations

(a) DEALER must purchase a minimum of $100,000 of Thomas Kinkade merchandise per location from MEDIA ARTS during each Term.

(i) If DEALER purchases the minimum amount of merchandise in the aggregate, all locations purchasing merchandise will retain the right to continue under the Signature Dealer level.

(ii) If DEALER fails to purchase the minimum amount of merchandise in the aggregate, specific locations purchasing less than the minimum amount may lose the right to continue under the Signature Dealer Level. In such event, MEDIA ARTS reserves the right to move DEALER to a lower strata (i.e. Authorized, Premier or Showcase Premier). This determination is in the sole discretion of MEDIA ARTS.

(iii) For purposes of illustration, assume DEALER has three locations (X, Y & Z), two of which (X & Y) purchased $75,000 each in a given full year:

A) If the Z location purchases at least $150,000, making the 3 locations aggregate total $300,000 for the year, ALL locations retain the Signature Gallery status.
B) If the Z location only purchased $125,000, (making aggregate merchandise purchases $275,000, which is $25,000 below the $300,000 aggregate minimum), the Z gallery could continue as a Signature Dealer as it achieved its individual minimum purchase level (at least $100,000), either X or Y galleries (each purchasing only $75,000, failing to meet their individual $100,000 minimum) would lose their Signature Gallery status, unless MEDIA ARTS, in its reasonable discretion, waived the Default. Only X or Y would lose its Signature status, since Z Gallery and the other gallery (X or Y) could still combine for an aggregate of $200,000 and remain Signature galleries.
C) If the Z location only purchased $100,000, (making aggregate merchandise purchases $250,000, which is $50,000 below the $300,000 aggregate minimum), the Z gallery could continue as a Signature Dealer as it achieved its individual minimum purchase level (at least $100,000), but both X or Y galleries (each purchasing only $75,000, failing to meet their individual $100,000 minimum) would lose their Signature Gallery status, unless MEDIA ARTS, in its reasonable discretion, waived the Default.
D) If the Z location purchases at least $300,000, all three locations would be permitted to retain Signature Gallery status, regardless of the performance of the X & Y locations.

(b) DEALER must prepay the opening order. DEALER's opening order must include at least one (1) of each Thomas Kinkade limited edition image still available from MEDIA ARTS.

(c) In order to be eligible to receive a DISTRICT, as defined and accepted by MEDIA ARTS, and attached as Exhibit A to this Dealer Agreement, DEALER must first submit an initial business plan which identifies plans for DISTRICT development, including any future planned locations. This plan must be approved by MEDIA ARTS; however, approval shall not be deemed to be any assurance or guarantee by MEDIA ARTS that such performance can or will be achieved.

(d) DEALER must accept an automatic shipment of three (3) each of every new limited edition image released. For clarification, if an image is released in multiple limited edition sizes, three (3) images total, as opposed to three (3) images of each size released, is required.

(e) 60% of DEALER's product orders provided to MEDIA ARTS (calculated as a percent of total invoice amounts to date) must be Gallery Proof product. If DEALER fails to purchase this minimum percentage of Gallery Proof merchandise (unless DEALER is unable to comply based on MEDIA ARTS' failure to make such product available for purchase), DEALER may lose the right to continue under the Signature Dealer Level. In such event, MEDIA ARTS reserves the right to move DEALER to a lower strata (i.e. Authorized, Premier or Showcase Premier). This determination is in the sole discretion of MEDIA ARTS.

(f) DEALER must have credit which is, and remains, in good standing.

(g) DEALER must sign this AGREEMENT.

(h) DEALER must have a retail location open a minimum of eight (8) hours per day, five (5) days per week, exclusive of national holidays observed, closings due to weather, or other matters beyond DEALER's control. Should seasonal conditions prohibit this, any variance must be approved in writing by MEDIA ARTS.

(i) DEALER must maintain levels of inventory at all times equal to the lesser of either $25,000.00 (calculated per location, in the aggregate, at wholesale value) or one of each limited edition image available from MEDIA ARTS.

(j) DEALER must display the limited edition images in a dedicated, stand-alone gallery approved by MEDIA ARTS ("dedicated" defined as selling only authorized Thomas Kinkade products). Such approval shall not be unreasonably withheld by MEDIA ARTS.

(k) DEALER will automatically be enrolled as a Dealer Member of the Thomas Kinkade Collector Society, and MEDIA ARTS will waive any initial or annual membership fee. DEALER will be automatically shipped "Members Only" pieces, which DEALER must purchase according to standard wholesale pricing.

(l) DEALER must participate in the Duratrans/Lightbox program, if program is available.

(m) DEALER must advertise a minimum of four (4) times per year in an approved manner (e.g. local media markets, etc).

(n) If DEALER becomes a "certified" DEALER, DEALER must have all staff members complete video training program, this video training program to be made available from by MEDIA ARTS.

(o) DEALER must attend and complete any other training programs as required by MEDIA ARTS, not to exceed two (2) times per year.

(p) DEALER must use any required or standard signage, including wording, as required by MEDIA ARTS, subject to requirements imposed by local laws or DEALER'S landlords.

4.    This AGREEMENT shall be terminated only upon material breach of this AGREEMENT by either party or when MEDIA ARTS no longer represents Thomas Kinkade limited edition product. "Material breach" shall include, but not be limited to, the following defaults:  Failure to maintain good credit standing, failure to purchase minimum merchandise levels, engaging in transshipping of product in violation of Sections 1 & 2 of the Standard Terms and Conditions, or the occurrence of any Default as identified in Section 12 of the Standard Terms and Conditions. This AGREEMENT may not be terminated if the defaulting party complies with the cure provisions set forth in the Standard Terms and Conditions.

5.    At the end of any Term of this AGREEMENT after the third (3rd) Term, this AGREEMENT may be modified or replaced, at the sole discretion of MEDIA ARTS, with the following restrictions:

(a)  Except for modification of any "Minimum Performance Level" of DEALER identified in Exhibit A (those "Minimum Performance Levels" being the minimum financial performance required to maintain the exclusive right to open Signature locations in the DISTRICT), DEALER's AGREEMENT may only be modified or replaced at the end of any Term if such modifications or changes reflect the same terms as those terms then being currently offered to new Signature dealers.

(b)  Should MEDIA ARTS modify any "Minimum Performance Level" of DEALER identified in Exhibit A, such modifications shall not result in any particular Minimum Performance Level increasing by more than 10% from the previous year.

(c)  MEDIA ARTS shall provide Dealer with ninety (90) calendar days advance written notice of its intention to exercise its rights under this Section 5 which notice shall include the revised provisions of the Agreement.

6.    This AGREEMENT shall not be deemed accepted by MEDIA ARTS until signed by an officer of MEDIA ARTS.

Agreed to and accepted:
MEDIA ARTS GROUP, INC.
521 Charcot Ave.
San Jose, CA 95131

Signed: _____

Print Name: James F. Landrum, Jr.
Title:  Sr. VP/General Counsel
Date:  7/14/99

DEALER: KAYNE ART GALLERIES OF GA, INC.
Location: MALL OF GA    4725 BUFORD DRIVE
T.K. AT MALL OF GA    SUITE: 1045A
                      BUFORD, GA 30519

Signed: _____

Print Name: DAVID KAYNE
Title:  President.
Date:  7-3-99

MEDIA ARTS GROUP, INC.
DEALER AGREEMENT

THOMAS KINKADE LIMITED EDITION
DEALER STATUS: SIGNATURE GALLERY DEALER

EXHIBIT A
SIGNATURE GALLERY DEALER "DISTRICT"

The following Media Arts Group, Inc. Dealer Agreement ("AGREEMENT") consists of the Signature Dealer Agreement ("Dealer Agreement"), Exhibit A which addresses Dealer's District ("Exhibit A") and the Standard Terms and Conditions as attached hereto and incorporated herein ("Terms and Conditions"). In the event of a conflict or inconsistency between such documents, the order of precedence shall be as follows: The Dealer Agreement and Exhibit A shall control over the Terms and Conditions; Exhibit A shall control over the Dealer Agreement.

Section 6(a) of the Media Arts Group, Inc. Standard Terms and Conditions provides:

> MEDIA ARTS' appointment of DEALER as an authorized dealer is non-exclusive, and MEDIA ARTS reserves the right at any time and for any reason to appoint additional authorized Dealers of the PRODUCTS in any location it chooses and to make sales directly or indirectly to any parties wherever located.

Notwithstanding the above section, MEDIA ARTS desires to provide certain DISTRICT preferences to Signature Gallery Dealers based on their increased level of commitment to the dedicated Thomas Kinkade gallery concept.

1.  "DISTRICT" shall be defined as either:
    a.  a predetermined number of stores at specifically identified locations, or
    b.  an exclusive geographic territory.
    Should DEALER perform to Minimum Performance Levels set forth below in Section 5, DEALER will have the exclusive right to open Signature Galleries in that DISTRICT during the Term of the AGREEMENT.

2.  "Business plan" shall be defined as the business plan required to be submitted pursuant to section 3(c) of the Media Arts Group Signature Gallery Dealer Agreement attached hereto.

3.  "Exclusive" or "Exclusivity" shall mean the exclusive right to open Signature Gallery locations in that particular DISTRICT.

4.  The granting of any DISTRICT is at the sole discretion of MEDIA ARTS. Before being approved for a DISTRICT, DEALER must provide a business plan which shall identify each of the following:

a.   The desired DISTRICT, including either a predetermined number of specific anticipated store locations (e.g. "XYZ Mall –San Jose, California") or an exclusive geographic territory (specifying exact geographic boundaries on a map). More specific identification of locations or geographic territory may be required for more densely populated areas.

b.   Dates when locations are expected to be opened (e.g. 1st location to open in September 1997, 2nd location to open in August 1998, 3rd location to open in September 1999). Dates should relate to projected dates of new gallery openings, but need not be location specific.

c.   Expected performance levels which support the position that opening the locations within the dates identified is reasonably achievable, including:
1.   Projected retail sales performance, and
2.   Projected wholesale purchases from MEDIA ARTS.

5.   In order for DEALER to acquire and retain "exclusive" rights to the DISTRICT, the following Minimum Performance Levels are required by MEDIA ARTS:

a.   Minimum Retail Sales Performance:
1. During year 1 of the AGREEMENT, DEALER must achieve minimum retail sales averaging $200,000 per location.
2. At the beginning of year 2, MEDIA ARTS will assign DEALER a minimum retail sales performance level for the DISTRICT, to be assigned according to a formula applied to every Signature Gallery.
3. DEALER must achieve sales equal to 50% or greater of this minimum retail sales performance level (assigned at year 2) in year 3 of the AGREEMENT.
4. DEALER must achieve sales equal to 100% or greater of the minimum retail sales performance level (assigned at year 2) in year 4 (and each subsequent year) of the AGREEMENT.

b.   Minimum Wholesale Purchases:
1. During year 1 of the AGREEMENT, DEALER must achieve minimum wholesale purchases from MEDIA ARTS averaging $100,000 per location.
2. At the beginning of year 2, MEDIA ARTS will assign DEALER a minimum level of wholesale purchases which must be purchased from MEDIA ARTS, to be assigned according to a formula applied to every Signature Gallery. Said wholesale purchase amount must be purchased for sale in the locations in the DISTRICT.
3. DEALER must achieve sales equal to 50% or greater of this minimum wholesale purchases level (assigned at year 2) in year 3 of the AGREEMENT.
4. DEALER must achieve sales equal to 100% or greater of this minimum wholesale purchases level (assigned at year 2) in year 4 (and each subsequent year) of the AGREEMENT.

c.   DEALER must open the specified number of DISTRICT locations on schedule, as set forth in the business plan. If leases at identified locations cannot be obtained at any of the identified locations, DEALER may select a comparable alternative location, the approval of which shall be given at MEDIA ARTS' reasonable discretion.

d.   DEALER must not be in material breach of any terms of the AGREEMENT.

e.   If any locations are open less than one full year, any minimum performance levels for that location shall be prorated accordingly.

6.    Provided that (i) DEALER remains in good standing under the AGREEMENT, and (ii) DEALER continues performing at levels equal to or greater than the Minimum Performance Levels Specified in Section 5 of this Exhibit A, then DEALER shall have the exclusive right to open Signature Gallery locations at the specific DISTRICT locations identified in the DEALER's business plan during the Term of the AGREEMENT.

    a.    This exclusive right shall be granted for the specific DISTRICT only.

    b.    This exclusive right shall be dependent upon DEALER's performance of all terms of the Media Arts Group Signature Gallery Dealer Agreement and the Standard Terms and Conditions, both attached hereto.

    c.    This exclusive right shall be granted so long as Minimum Performance Levels specified in Section 5 (or if subsequently modified, any modified Minimum Performance Levels) are achieved.

7.    To the extent required to determine DISTRICT exclusivity, the business plan may not be modified without the prior approval of MEDIA ARTS.

8.    MEDIA ARTS reserves the right to open other non-Signature dealers in any geographic territory or DISTRICT (including Authorized, Premier, Showcase Premier and company-owned stores) and use other distribution methods which may result in sales in that DISTRICT (including but not limited to mass market distributors, mail order distributors and home shopping channels such as QVC). Notwithstanding the above, (a) MEDIA ARTS agrees it shall not open any company-owned store in the same mall location as DEALER, provided DEALER is already located in the mall location in question as a Signature Gallery location prior to MEDIA ARTS' opening of such company-owned store, and (b) MEDIA ARTS shall not open any company-owned store within a one (1) mile radius of a "walk and shop" or strip mall location of DEALER, provided DEALER is already located in the location in question as a Signature Gallery location prior to MEDIA ARTS' opening of such company-owned store.

Agreed to and accepted:

MEDIA ARTS GROUP, INC.
521 Charcot Ave.
San Jose, CA 95131

Signed: _James F. Landrum_
Print Name: James F. Landrum, Jr.
Title: Sr. VP/General Counsel
Date: 7/14/99

DEALER- _KAYNE Art Galleries of GA, inc_
Location: _MALL of GA_      _3878 PH0000 DRWE_
_T.K At MALL of GA_      _Suite 1045A_
_PUFORD, GA 30519_

Signed: _David Kayne_
Print Name: _DAVID KAYNE_
Title: _President_
Date: _7-2-99_

MAGI/Lightpost Dealer Agreement
Signature Gallery Dealer
Exhibit A – DISTRICT
Page 8 of 14 Version 120997

# MEDIA ARTS GROUP, INC.
## STANDARD TERMS AND CONDITIONS

The following Media Arts Group, Inc. Dealer Agreement ("AGREEMENT") consists of the Signature Dealer Agreement ("Dealer Agreement"); Exhibit A which addresses Dealer's District ("Exhibit A") and the Standard Terms and Conditions as attached hereto and incorporated herein ("Terms and Conditions"). In the event of a conflict or inconsistency between such documents, the order of precedence shall be as follows: The Dealer Agreement and Exhibit A shall control over the Terms and Conditions; Exhibit A shall control over the Dealer Agreement.

1.    **Appointment as Dealer**

Upon the signing of the attached AGREEMENT by both parties, MEDIA ARTS appoints DEALER as its authorized dealer to sell any PRODUCTS approved by MEDIA ARTS for sale by DEALER at the Location(s) specified. "PRODUCTS" shall be defined as limited edition and open edition Thomas Kinkade products produced, licensed and/or sold by MEDIA ARTS. DEALER accepts such appointment subject to the terms and conditions set forth within.

2.    **Restrictions on Sales**

a.    DEALER shall sell PRODUCTS only to retail customers. With prior approval of MEDIA ARTS, DEALER may sell to other MEDIA ARTS dealers who are authorized to sell such PRODUCTS.

b.    DEALER shall not sell to any unauthorized dealers, nor shall DEALER solicit or accept any orders for PRODUCTS from any such dealers. DEALER shall not buy PRODUCTS from any unauthorized dealers, except in cases where such PRODUCT is no longer available from MEDIA ARTS.

c.    DEALER shall not transship PRODUCT to any other location. DEALER shall not transship any PRODUCT to any location nor receive any transshipped PRODUCT to DEALER's location without approval of MEDIA ARTS. Notwithstanding this restriction, DEALER is permitted to ship product between other Locations owned by DEALER. If DEALER is a Signature Dealer, DEALER is permitted to ship product between other Signature Locations, within the same District, which are owned by DEALER. DEALER is not permitted to ship any product exclusive to any other dealer if such dealer is not authorized to carry such product (e.g. shipping products exclusive to Signature Gallery to a non-Signature Gallery location, regardless of whether owned by same DEALER and regardless of whether it is in the same DISTRICT).

d.    DEALER shall not sell any unauthorized products incorporating artwork found in the PRODUCTS, including but not limited to framed calendars, framed or mounted cards, or other products which are either unapproved by MEDIA ARTS or which constitute infringing products. Where DEALER is unaware of whether the product is authorized, DEALER agrees to submit such product to MEDIA ARTS for written approval prior to selling such product.

3.    **The PRODUCTS**

a.    During each contract year, DEALER shall purchase PRODUCTS having a minimum total cost to DEALER of that amount, if any, set forth in the AGREEMENT.

b.    Sales Quota:  MEDIA ARTS may, on a periodic basis, assign to DEALER a minimum quantity quota or annual dollar volume requirement of net purchases of MEDIA ARTS PRODUCTS. "Net Purchases" shall mean all purchases of PRODUCTS, less returns, calculated at the net prices actually paid after computing allowances paid or credited to DEALER.

c.    MEDIA ARTS shall periodically provide DEALER with a list ("INVENTORY LIST") of PRODUCTS available for purchase by DEALER in accordance with the terms of the AGREEMENT, and the sales and promotional policy statements that may be issued by MEDIA ARTS on a periodic basis, and DEALER shall advise MEDIA ARTS, in writing or by telephone or facsimile, as to which PRODUCTS it wishes to purchase in excess of any minimum requirements.

d.    MEDIA ARTS reserves the right to require minimum unit requirements for orders on certain PRODUCTS (e.g., requirement that certain PRODUCTS be purchased in multiples of 3). Such minimum requirements shall be stated on the INVENTORY LIST or other written notice. If DEALER is in material breach of this AGREEMENT in other respects and has failed

to cure after required notice is given, DEALER's compliance with any or all minimum order requirements does not obligate MEDIA ARTS to continue the dealership.

4.  **Purchase Price to DEALER:  Terms of Sale**

a.  MEDIA ARTS shall sell PRODUCTS to DEALER at prices determined within the sole discretion of MEDIA ARTS.

b.  Unless specified otherwise, payments by DEALER for PRODUCTS shall be made by DEALER within thirty (30) days from the date of each invoice.  A finance charge of 1.5% per month shall be charged to all past due balances. DEALER shall be notified of any changes to the Dealer Finance Charge.  All sales are final, except for returns for defects in workmanship where merchandise is returned pursuant to MEDIA ARTS' standard return policies.

c.  DEALER shall be responsible for the payment of all shipping charges applicable to the delivery of the PRODUCTS by MEDIA ARTS.  All PRODUCTS will be shipped F.O.B. ORIGIN. Shipping charges will be billed to DEALER and shall be paid in accordance with paragraph b of this section 4.

d.  MEDIA ARTS reserves the right to restrict or suspend shipment(s) if DEALER maintains an unpaid balance beyond a 30-day term (or if a longer term granted, e.g. 90 days, that longer term).  In addition, DEALER shall be liable for all costs and expenses of collection, including attorneys fees.

e.  MEDIA ARTS reserves the right to allocate its inventory of PRODUCTS among and between its dealers and company stores in such a manner as it may, at its sole discretion, determine and shall not be liable to DEALER for any damages, monetary or otherwise, due to MEDIA ARTS' failure to fill orders, in whole or in part, by reason of this allocation.

f.  MEDIA ARTS shall have the right, in the exercise of its sole discretion, to cancel any purchase orders accepted by MEDIA ARTS or to delay the shipment of PRODUCTS covered thereby, if DEALER fails to make any payment when due or satisfy any other credit or financial requirements established by MEDIA ARTS.

5.  **Obligations of DEALER**

a.  DEALER shall use its reasonable efforts to properly promote the sale of PRODUCTS from its Location(s).

b.  DEALER shall maintain and operate the approved Location(s), and shall display and sell the PRODUCTS, in a manner consistent with the high reputation and integrity of the artists represented by MEDIA ARTS, and of MEDIA ARTS.

c.  DEALER shall operate from a retail space.

d.  The Location shall be open a minimum of five (5) days per week, eight (8) hours per day.

e.  The hours of the business shall be displayed in a manner which can be read by the public from the outside of the business.

f.  Any minimum inventory identified in the AGREEMENT or any subsequent notice by MEDIA ARTS shall be maintained, unless such minimum inventory cannot be maintained due to being unavailable from MEDIA ARTS.

g.  Any minimum number of PRINTS identified in the AGREEMENT or any subsequent notice by MEDIA ARTS shall be suitably framed and on display on a PROMINENT wall in the retail area of the gallery at all times.

h.  All State and Federal laws applicable to the sale of fine art prints, and in particular, those relating to disclosure of relevant information, shall be observed.  Where MEDIA ARTS is aware of the existence of such laws , MEDIA ARTS will use its best efforts to  advise DEALER of such laws relating specifically to the products to be sold by DEALER.  MEDIA ARTS' efforts may extend to providing DEALER with notice of laws, regulations, rules and  claims which apply to the products which have the potential to materially impact the conduct of DEALER's business. MEDIA ARTS' efforts does not extend to providing legal advice to DEALER.  DEALER must seek independent legal counsel to insure compliance with laws.

i.  Any framing provided by DEALER shall be of a standard commensurate with the quality of the artwork being framed.  Such framing shall be comparable to the framing typically performed on such products by other dealers.

j.  Dealer shall maintain a current credit status.

k.  DEALER shall make no material misrepresentations about the PRODUCTS or about MEDIA ARTS.

l.  DEALER will at all times conduct business in a manner that will reflect favorably on the PRODUCTS, the artists, MEDIA ARTS trademarks, and the good name and reputation of MEDIA ARTS.  In particular, DEALER will not make any false or misleading representations concerning its business as a dealer of limited edition PRODUCTS or concerning the method and manner by which the PRODUCTS were created or the PRODUCTS past, present, or future retail or market value.  Further, DEALER will comply with all applicable Federal, State and Local laws and regulations in conducting its business as a dealer of limited edition PRODUCTS.

m.  DEALER will maintain reasonably adequate inventories of all categories of PRODUCTS to enable it to supply with reasonable promptness the consumer demand for the PRODUCTS of MEDIA ARTS, subject to MEDIA ARTS' providing of PRODUCTS ordered by DEALER to DEALER in a timely manner.

n.  Upon MEDIA ARTS' request, DEALER will furnish copies of any DEALER created advertisements and promotional materials featuring MEDIA ARTS or its PRODUCTS.  MEDIA ARTS may request such materials for approval prior to printing, or may request such materials after printing.  If requested by MEDIA ARTS prior to printing, MEDIA ARTS agrees to approve such advertising within 7 working days, and if such approval is not given within such time, the advertising shall be deemed acceptable to MEDIA ARTS.

6.  Rights and Obligations of MEDIA ARTS

a.  MEDIA ARTS' appointment of DEALER as an authorized dealer is non-exclusive, and MEDIA ARTS reserves the right at any time and for any reason to appoint additional authorized Dealers of the PRODUCTS in any location it chooses and to make sales directly or indirectly to any parties wherever located.

b.  MEDIA ARTS shall make appropriate efforts, in its sole discretion, to advertise and promote the image and reputation of MEDIA ARTS PRODUCTS and shall supply DEALER with "Authorized Dealer" literature and sales material relating to MEDIA ARTS and its products.

7.  Copyright Protection

a.  DEALER acknowledges that all copyrights relating to the PRODUCTS are held by artist, an entity through which the artist works, or by MEDIA ARTS.  DEALER agrees that it shall not reproduce any PRODUCTS (except in newspaper, magazine or television advertisement) without the prior written consent of MEDIA ARTS, as agent for the artist.  When used in any newspaper, magazine or television advertisement, the image of the PRODUCTS shall be accompanied by the following notice: "Copyright [year], [name of artist], all rights reserved. "  All copyright notices shall be of such size and in such location as to be readily observable.

b.  MEDIA ARTS represents and warrants that it has the right to enter this AGREEMENT, to sell the PRODUCTS to DEALER for the purposes stated herein, and is authorized to act as the agent for the artists.

c.  MEDIA ARTS shall indemnify and defend DEALER against any claims that (i) the PRODUCT infringes upon any United States patent or copyright, or (ii) any other claim, demand or losses associated with the unauthorized reproduction, sale or possession of PRODUCTS.  In case of any action or proceeding brought against DEALER in connection with the PRODUCTS claiming copyright infringement, unauthorized sale or unauthorized duplication of the PRODUCTS, MEDIA ARTS shall, at its own cost and upon prompt notice from DEALER, settle or resist and defend such action or proceeding using MEDIA ARTS' reasonable discretion.

d.  The foregoing representations, warranties and indemnification shall survive termination or expiration of this AGREEMENT.

8.  Inspection of Shipments;  Damaged PRODUCTS

In the event that any PRODUCTS delivered by MEDIA ARTS to DEALER are damaged or in any other manner defective, DEALER must notify MEDIA ARTS' Customer Service Department to such effect within 30 days of receipt (by telephone or facsimile), and DEALER may return the damaged or defective PRODUCTS to MEDIA ARTS for replacement.  Damaged goods may not be returned to the freight line.  MEDIA ARTS will arrange for pickup or issue a call tag for return of the damaged PRODUCTS.  All charges in connection with such return and redelivery shall be at the expense of MEDIA ARTS.  No credit shall issue unless merchandise is received by

MEDIA ARTS. Unauthorized chargebacks will not be accepted, e.g. service charges for defective merchandise will not be accepted. If DEALER fails to notify MEDIA ARTS of damage or defect with such 30 day period, an administrative fee of $10.00 or 15% of the value of the damaged merchandise, whichever is higher, will be charged in connection with such replacement and redelivery. MEDIA ARTS does not guarantee availability of replacement PRODUCTS.

9.    Security Agreement

DEALER hereby grants MEDIA ARTS a security interest in all PRODUCTS purchased or to be purchased by DEALER pursuant to this AGREEMENT, to secure DEALER's payment of all amounts payable by DEALER to MEDIA ARTS hereunder when due. MEDIA ARTS on request of a landlord or commercial lender will subordinate its security interest. A photocopy of this AGREEMENT may be filed by MEDIA ARTS as a financing statement. DEALER agrees to execute any documents necessary to enable MEDIA ARTS to perfect its security interest.

10.    Warranties and Representations

a.    DEALER represents that it has the right and power to enter into and perform the AGREEMENT and the accompanying Terms and Conditions, and has taken any and all steps necessary and appropriate to authorize the execution and performance hereof.

b.    MEDIA ARTS represents that it has the right and power to enter into and perform the AGREEMENT and the accompanying Terms and Conditions, and has taken any and all steps necessary and appropriate to authorize the execution and performance hereof.

11.    Termination

a.    This AGREEMENT may be terminated by either party upon forty-five (45) days written notice (or upon ten (10) days notice in event of a payment Default) to the other party if said other party is in Default (as defined below) or material breach of any provisions of the AGREEMENT or these Terms and Conditions, and has failed to cure such Default as provided for below.

b.    In the event of a Default by either party, the non-defaulting party shall provide the defaulting party with specific written notice of the alleged Default to enable the defaulting party to verify or dispute the Default together with an opportunity to cure such Default. For payment Defaults, the cure period shall be ten (10) business days. For non-payment Defaults which are capable of

being cured, the cure period shall be forty-five (45) days or such additional time as may be reasonably necessary to cure such Default so long as the defaulting party commences reasonable efforts to cure such Default within the forty-five (45) day period and pursues such efforts without lapse until completion. For unintentional non-payment Defaults which, by their nature cannot be cured, the defaulting party shall institute commercially reasonable steps to prevent recurrence of such Default. For intentional non-payment Defaults which, by their nature cannot be cured, the non-defaulting party may terminate immediately.

c.    Upon such termination, the entire unpaid balance of payments outstanding shall immediately become due and payable. Any orders in process, but not shipped by the date of termination, shall be canceled. Upon termination for any reason, MEDIA ARTS shall have the option to purchase unsold PRODUCT and DEALER shall receive credit or reimbursement for such items in an amount equivalent to DEALER's purchase price of such PRODUCT. Any PRODUCT not repurchased by MEDIA ARTS may be sold at DEALER's discretion.

d.    The AGREEMENT will remain in effect only for the Location set forth. Should DEALER change Location without the prior written consent of MEDIA ARTS, this AGREEMENT shall immediately terminate. Upon such termination, the entire unpaid balance of payments outstanding shall immediately become due and payable. Any orders in process, but not shipped by the date of termination, shall be canceled.

12.    Default

The following shall be events of default hereunder: if either party (i) becomes the subject of any bankruptcy proceeding, becomes insolvent, makes an assignment for the benefit of its creditors, or receiver, liquidator or trustee is appointed for its affairs, (ii) fails to make payments on invoices, guarantee(s) and/or any other sums payable to the other party pursuant to the AGREEMENT and/or Terms and Conditions when due, or fails to perform any of its material obligations hereunder, or otherwise breaches any representation, warranties, covenant or agreement referred to or contained in this AGREEMENT, or (iii) discontinues its business or loses any license or authorization required to permit such party to perform fully its obligations hereunder pursuant to any final action of any duly constituted governmental, judicial or legislative authority.

13.    Remedies and Liabilities

a.    Except as expressly limited hereunder, MEDIA ARTS and DEALER shall have the full benefit of all remedies and defenses generally available to a seller or purchaser of goods under the Uniform Commercial Code.

b.    EXCEPT FOR DAMAGES ARISING FROM BODILY INJURY CAUSED SOLELY BY THE NEGLIGENCE OF MEDIA ARTS, MEDIA ARTS SHALL NOT BE LIABLE TO DEALER FOR ANY CLAIM ARISING OUT OF THIS AGREEMENT IN AN AMOUNT EXCEEDING THE TOTAL AMOUNT OF PAYMENTS ACTUALLY RECEIVED BY MEDIA ARTS HEREUNDER.

c.    EXCEPT FOR DAMAGES ARISING FROM BODILY INJURY CAUSED SOLELY BY THE NEGLIGENCE OF DEALER, DEALER SHALL NOT BE LIABLE TO MEDIA ARTS FOR ANY CLAIM ARISING OUT OF THIS AGREEMENT IN AN AMOUNT EXCEEDING THE TOTAL AMOUNT OF PAYMENTS ACTUALLY RECEIVED BY MEDIA ARTS HEREUNDER.

d.    IN NO EVENT SHALL EITHER PARTY BE LIABLE HEREUNDER FOR ANY INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES (INCLUDING LOST BUSINESS PROFITS) SUSTAINED BY THE OTHER PARTY OR ANY OTHER INDIVIDUAL OR ENTITY FOR ANY MATTER ARISING OUT OF, ABOUT, OR PERTAINING TO THE SUBJECT MATTER OF THIS AGREEMENT.

e.    THE PARTIES FURTHER WAIVE ALL RIGHTS TO CLAIM OR RECEIVE PUNITIVE DAMAGES. THE PARTIES HEREBY EXPRESSLY ACKNOWLEDGE THAT THE FOREGOING LIMITATION HAS BEEN NEGOTIATED BY THE PARTIES AND REFLECTS A FAIR ALLOCATION OF RISK.

14.    No Joint Venture

Nothing herein contained shall be construed to place the parties in the relationship of partners, franchiser-franchisee, agents or joint venturers, and neither party shall have the power to obligate or bind the other in any manner whatsoever.

15.    No Assignment or Sublicense by DEALER

a.    The AGREEMENT and all rights and duties hereunder are personal to DEALER and shall

not, without written consent of MEDIA ARTS, be assigned or encumbered in any way by DEALER. For the purposes of this paragraph, an assignment shall also be deemed to have been made upon an unauthorized change in location, transfer of ownership of a majority interest, or a material change in control of DEALER's business. Notwithstanding the foregoing, DEALER may assign its interest in this Agreement to a subsidiary or other affiliate under common control, without the prior consent MEDIA ARTS, provided that any such assignment shall not diminish DEALER's ability to perform its obligations hereunder.

b.    DEALER shall have the opportunity to identify and negotiate with a third party ("Purchaser") for the purchase of DEALER's rights and obligations under this Agreement and may assign its rights and obligations to such Purchaser and thereby be relieved of its obligations hereunder if the following conditions are first satisfied:  (i) DEALER provides MEDIA ARTS with written notice of its intent to transfer its interest to Purchaser (which notice shall specify the material terms and conditions of such intended transfer as well as Purchaser's qualifications), and (ii) commencing on the day MEDIA ARTS receives such notice, MEDIA ARTS will have a reasonable opportunity (not to exceed thirty (30) days) to notify DEALER that it will exercise a right of first refusal to complete the transaction in place of the Purchaser, in which case MEDIA ARTS (or its nominee) shall complete such transaction within sixty (60) days of the notice to MEDIA ARTS under subpart (i) above, and (iii) if MEDIA ARTS fails to exercise its rights under subpart (ii) above then DEALER may complete the transfer of their interest to Purchaser on the stated terms, as stated herein.

16.    Confidentiality

All terms of the AGREEMENT, these Terms and Conditions, information relating to the performance thereof, and the business of the parties, are to be kept strictly confidential by both parties.

17.    Waiver

Waiver of any term or provision of the AGREEMENT or these Terms and Conditions, or forbearance to enforce any term, provision or breach thereof, shall not constitute a waiver as to any subsequent breach or failure of the same term or provision or a waiver of any other term or provision.

18.    Force Majeure

If a party is unable to perform its obligation hereunder due to causes beyond such party's reasonable control including, but not limited to, floods brought about by natural causes, act of God, act or default of the other party, its agents, servants, or employees, riot or public disaster ("Force Majeure") and such party notifies the other within ten (10) days of the inception of the inability then such party shall not be liable to the other for damages or failure to perform during the event of Force Majeure. This provision shall not relieve such party of any liability for damages attributable to its own negligence in failing to perform any of its obligations hereunder or from maintaining insurance coverage as required hereunder. If a party's inability to perform due to an event of Force Majeure continues for more than thirty (30) days then either party may terminate this agreement on thirty (30) days written notice to the other party.

19.    Survival of Rights

The expiration or termination of the AGREEMENT for any reason shall not release either party from any liability, obligation or agreement which, pursuant to any provision of the AGREEMENT or these Terms and Conditions, is to survive or is to be performed after such expiration or termination.

20.    Period In Which to Submit Disputes

Notice of all disputes shall be submitted to the other party within one (1) year from the date facts occur which create the basis for such dispute. Failure to provide notice of any dispute within such time shall result in waiver of right to submit any dispute relying upon such facts.

21.    Notices

All notices and other communication required or permitted by the AGREEMENT or these Terms and Conditions to be in writing shall be deemed to have been received by the party and to be effective either (i) the day on which such notice is hand delivered or (ii) if mailed by certified mail, return receipt requested, on the fifth business day after the date of mailing. Any written notice shall be sent to the address of the party to be noticed, as stated in the AGREEMENT or as otherwise later identified.

22.    Arbitration

THE PARTIES AGREE THAT ALL DISPUTES BETWEEN THEM SHALL FIRST BE SUBMITTED FOR INFORMAL RESOLUTION TO THEIR CHIEF EXECUTIVE OFFICERS, OR IF NO CHIEF EXECUTIVE OFFICER, TO THE OWNERS. ANY REMAINING DISPUTE SHALL BE SUBMITTED TO A PANEL OF THREE (3) ARBITRATORS WITH EACH PARTY CHOOSING ONE (1) PANEL MEMBER, AND

THE THIRD PANEL MEMBER BEING CHOSEN BY THE FIRST TWO (2) PANEL MEMBERS. THE PROCEEDINGS SHALL BE CONDUCTED IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION. THE AWARD OF THE ARBITRATORS SHALL INCLUDE A WRITTEN EXPLANATION OF THEIR DECISION. THIS ARBITRATION PROCEEDING WILL BE BINDING UPON THE PARTIES.

23.    Counterparts

This AGREEMENT may be executed in counterpart, each of which shall be deemed to be an original and all of which taken together shall constitute one and the same document.

24.    Governing Law

This AGREEMENT shall be interpreted in accordance with and governed by the laws of the state of California, county of Santa Clara, regardless of the place of its execution or performance.

25.    Waiver of Jury Trial

The parties agree that neither party shall have the right to a jury trial. Should the Arbitration clause of this AGREEMENT be determined to be void or unenforceable, the parties agree that all rights to a jury trial have been waived and that the remainder of this AGREEMENT shall remain in full force and effect.

26.    Ambiguity

Any ambiguity in this AGREEMENT shall not be construed for or against any party based upon who prepared such terms.

27.    Severability

Should any provision of this AGREEMENT be found to be void or unenforceable, the remainder of this AGREEMENT shall remain in full force and effect.

28.    Entire Agreement

The AGREEMENT and these Terms and Conditions contain the entire understanding of the parties. There are no representations, warranties, promises, covenants, or understandings other than those contained herein.

--------------

END OF STANDARD TERMS AND CONDITIONS